**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

ROBERT V. PRONGAY
LESLEY F. PORTNOY
PAVITHRA RAJESH
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East
Los Angeles, CA 90067
Telephone: (310) 201-9150

2

3

4

5

MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
GLANCY PRONGAY & MURRAY LLP
712 Fifth Avenue
New York, NY 10019
(212) 935-7400

6

7

8

9

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

GUYE LEE, derivatively on behalf of
SYMANTEC CORPORATION,

Plaintiff,

13

14

v.

15

GREGORY S. CLARK, FRANK E.
DANGEARD, KENNETH Y. HAO,
DAVID W. HUMPHREY, DAVID L.
MAHONEY, ANITA M. SANDS,
DANIEL H. SCHULMAN, V. PAUL
UNRUH, SUZANNE M. VAUTRINOT,
NICHOLAS R. NOVIELLO, MARK S.
GARFIELD, ROBERT S. MILLER, and
GERALDINE B. LAYBOURNE

16

17

18

19

20

Defendants.

21

-and-

22

SYMANTEC CORPORATION, a
Delaware Corporation,

23

24

Nominal Defendant.

Case No.

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY,
*BROPHY* CLAIM, UNJUST
ENRICHMENT, AND VIOLATIONS
OF § 14 OF THE SECURITIES
EXCHANGE ACT OF 1934**

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Plaintiff Guye Lee, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Symantec Corporation ("Symantec" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*i.e. Brophy* claim), unjust enrichment, and violations of § 14 of the Securities Exchange Act of 1934. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included the review and analysis of: (a) documents and information obtained pursuant to 8 Del. C. § 220 ("Section 220") ("the 220 Demand"); (b) public filings made by Symantec and other related parties and non-parties with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by certain of the Defendants (defined herein) and other related non-parties; and (d) other publicly available information concerning Symantec and Defendants.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Symantec provides cybersecurity products and services, including its flagship Norton Antivirus software.

2.      In 2016, Symantec acquired Blue Coat Systems, Inc. ("Blue Coat"), a privately-held network security firm. Following the acquisition, Blue Coat's Chief Executive Officer ("CEO"), Gregory S. Clark ("Clark"), became CEO of Symantec and installed former Blue Coat executives in key executive roles at Symantec, including Chief Operating Officer, Chief Financial Officer, Chief Strategy Officer, Chief Technology Officer, and Head of Worldwide Sales.

3.      After acquiring Blue Coat, Symantec announced the acquisition of LifeLock, Inc. ("LifeLock"), a consumer identity-protection company. Symantec's new leadership claimed that the acquisitions would be "transformative" for the Company by reinvigorating its stagnant

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Enterprise and Consumer business segments and by providing benefits from synergies and other cost savings initiatives. According to Symantec executives, the Company would emerge as the most dominant provider of cybersecurity solutions.

4.     To meet these lofty promises, the Defendants manipulated Symantec's core financial metrics. Defendants improperly recorded ongoing costs as "transition costs" and removed them from their adjusted operating expenses, thus inflating non-GAAP revenue, operating income, and earnings per share, which were used to determine executive bonus compensation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

5.     Moreover, Defendants also improperly recognized revenue on sales that: (i) did not have signed contracts; (ii) did not go through the appropriate approval channels; (iii) contained unapproved extended terms; or (iv) were to customers who were unable or unwilling to pay.

6.     In 2017, while they were disclosing artificially inflated non-GAAP revenue and operating income and otherwise misrepresenting the Company's performance, the Board issued a proxy statement soliciting, and ultimately obtaining, shareholder approval to increase the Company's 2013 Equity Incentive Plan by 8 million shares. However, the proxy statement soliciting the votes misleadingly represented that Symantec's Executive Annual Incentive Plan ("AIP") 2017 non-GAAP revenue and operating targets had been exceeded, resulting in the payment of over millions of dollars to Symantec executives.

7.     Plaintiff's investigation demonstrates that unbeknownst to the shareholders who voted to amend the 2013 Equity Incentive Plan, both the non-GAAP revenue and operating income results that were the basis of these payouts were artificially inflated by improper adjustments. Had the appropriate adjustments been applied, funding under the non-GAAP revenue metric of the AIP would have been zero, as opposed to 100%, and funding under the non-GAAP operating income metric would have been zero, as opposed to 125%.

<u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>

8. Defendants issued public statements touting the Company's non-GAAP revenue and operating income performance as the fruits of successful acquisition integration until May 10, 2018, when they disclosed that the Audit Committee had commenced an internal investigation into the Company's accounting practices due to concerns raised by a former employee. Given the investigation, the Company disclosed that it had frozen executive incentive compensation, that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."

9. On this news, the Company's stock price fell $9.66 per share, or more than 33%, to close at $19.52 per share on May 11, 2018.

10. On September 24, 2018, the Company revealed the conclusions of the Audit Committee investigation. Among other things, there were weak and informal processes governing the review and approval of transition expenses; the Company had improperly recognized $12 million as revenue in the Q4 2018 which should have been deferred; and the Company would have to revise previously issued financial statements for Q4 2018 and Q1 2019.

11. These revelations precipitated the filing of a securities class action in this District against Symantec and certain officers, *Felix v. Symantec Corp., et al.*, 3:18-cv-02902-WHA (the "Securities Class Action").

12. Suspecting wrongdoing, on May 23, 2018, plaintiff served a books and records demand on the Company pursuant to § 220 of the General Corporation Law of the State of Delaware. After negotiations, the Company produced documents and information subject to a confidentiality agreement in response to the demand. The books and records production forms the basis for many of the factual allegations herein.

13. Due to information obtained in response to the books and records demand, plaintiff did not make a litigation demand on the Board prior to filing this action. The Board is currently composed of thirteen members. Of those thirteen members, nine are named as defendants in this action, and the remaining directors were appointed to the Board after the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1 wrongdoing. ███████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████   Additionally, each of the nine

11 directors solicited shareholder votes in approval of the amendment to the 2013 Equity Incentive

12 Plan on the basis of a proxy statement that misrepresented Symantec's results and concealed the

13 wrongful payment of millions of dollars in incentive compensation.   Thus, at least half of

14 Symantec's current Board is not disinterested and independent and/or faces a substantial

15 likelihood of liability in connection with the wrongdoing detailed herein.

16 **II.** **JURISDICTION AND VENUE**

17 14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that

18 this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange

19 Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein

20 pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a

21 court of the United States which it would not otherwise have.

22 15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a

23 substantial portion of the transactions and wrongs complained of herein occurred in this District,

24 and the Defendants have received substantial compensation in this district by engaging in

25 numerous activities that had an effect in this District.

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## III.   THE PARTIES

**Plaintiff**

16.     Plaintiff Guye Lee purchased Symantec stock in 2001 and has continuously owned Symantec stock since that time.

**Nominal Defendant**

17.     Nominal Defendant Symantec is a corporation incorporated under the laws of Delaware with its principal executive offices located at 350 Ellis Street, Mountain View, California 94043.  Symantec provides cybersecurity products and services, including its flagship Norton Antivirus software.  The Company's stock trades on the NASDAQ exchange under the symbol "SYMC."

**Defendants**

18.     Defendant Gregory S. Clark ("Clark") has been a director, CEO, and President of the Company since August 2016.  Prior to joining the Company, Defendant Clark was the CEO and a director of Blue Coat from 2011 to August of 2016.

19.     Defendant Frank E. Dangeard ("Dangeard") has served as a director of the Company since 2007.   Dangeard is, and was at relevant times, a member of the Audit Committee.

20.     Defendant Kenneth Y. Hao ("Hao") has served as a director of the Company since 2016.

21.     Defendant David W. Humphrey ("Humphrey") has served as a director of the Company since 2016.  Humphrey was a member of the Audit Committee until late 2018.

22.     Defendant David L. Mahoney ("Mahoney") has served as a director of the Company since 2013.

23.     Defendant Anita M. Sands ("Sands") has served as a director of the Company since 2013.  Sands is, and was at relevant times, a member of the Audit Committee.

24.     Defendant Daniel H. Schulman ("Schulman") has served as a director of the Company since 2000 and as Chairman of the Board since 2013.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

25. Defendant V. Paul Unruh ("Unruh") has served as a director of the Company since 2005. Unruh is, and was at relevant times, the Chair of the Audit Committee.

26. Defendant Suzanne M. Vautrinot ("Vautrinot") has served as a director of the Company since 2013. Vautrinot is, and was at relevant times, a member of the Audit Committee.

27. Defendant Nicholas R. Noviello ("Noviello") has been the Chief Financial Officer ("CFO") of the Company since December 1, 2016. On January 31, 2019, Noviello announced that he would leave Symantec after a transition period while the Company searched for a successor. Prior to joining the Company, Noviello served as Blue Coat's CFO.

28. Defendant Mark S. Garfield ("Garfield") was the Chief Accounting Officer of the Company from February 3, 2014 to August 7, 2017.

29. Defendant Robert S. Miller ("Miller") was a director of the Board from 2003 until 2018. Miller was a member of the Audit Committee.

30. Defendant Geraldine B. Laybourne ("Laybourne") was a director of the Board from 2008 to 2018.

31. Defendants Clark, Noviello, and Garfield are sometimes referred to herein as the "Officer Defendants."

32. Defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, Vautrinot, Miller, and Laybourne are sometimes referred to herein as the "Director Defendants."

**Non-Party Directors**

33. Non-party director Sue Barsamian has served as a director of Symantec since January 7, 2019.

34. Non-party director Richard S. Hill has served as a director of Symantec since January 7, 2019.

35. Non-party director Peter A. Feld has served as a director of Symantec since 2018.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

36.     Non-party director Dale L. Fuller has served as a director of Symantec since 2018.

## IV.     DUTIES OF THE OFFICER AND DIRECTOR DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of Symantec and because of their ability to control the business and corporate affairs of Symantec, at all relevant times defendants owed Symantec and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Symantec in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of Symantec and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Symantec and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     Defendants, because of their positions of control and authority as directors and/or officers of Symantec, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Symantec, each of the defendants had knowledge of material non-public information regarding the Company.

39.     To discharge their duties, the officers and directors of Symantec were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Symantec were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.   SYMANTEC'S CODES OF CONDUCT AND OF ETHICS

40.     Symantec's Code of Conduct ("Code of Conduct") "defines what [the Company] expect[s] from all employees."

41.     The Code of Conduct provides, as to "Finance and Accounting Practices," that employees must "accurately and completely record any financial information related to Symantec's revenues and expenses."  It further provides:

> The Audit Committee is directly responsible for the appointment, compensation, and oversight of the work of the Company's independent auditors and work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents.  Violations of laws associated with accounting and financial reporting can damage Symantec's REPUTATION, and can also result in fines, penalties, and even imprisonment.  You should promptly report to the Chief Financial Officer, General Counsel or the Audit Committee of the Board of Directors any conduct that you believe to be a violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

42.     The Company also adopted its Financial Code of Ethics ("Code of Ethics") which provides certain practices "to ensur[e] compliance with the highest standards of financial accounting and reporting."  The Code of Ethics requires the CEO, CFO, and other members of the Company's Finance Department to, among other things: (i) "Communicate information in a manner that ensures full, fair, accurate, timely and understandable disclosure in reports and documents that Symantec files with, or submits to, government agencies and in other public communications"; and (ii) "Comply with applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies."

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Background

43.   On June 12, 2016, Symantec announced that it would acquire Blue Coat, a leader in the web and cloud security industry, for $4.65 billion.  The acquisition closed on August 1, 2016.

44.   Following the acquisition, Blue Coat executives—CEO, defendant Clark; CFO, defendant Noviello; Chief Technology Officer, Hugh Thompson; Chief Operating Officer ("COO"), Michael Fey; Chief Marketing Officer, Michael Williams; and Chief of Staff, Matt MacKenzie—all assumed identical posts at Symantec.

45.   On November 20, 2016, Symantec announced that it would acquire LifeLock, an identity-protection software company, for $2.3 billion.  The acquisition closed on February 3, 2017.

46.   In addition to $550 million in cost synergies from the Blue Coat acquisition, the Defendants claimed that the LifeLock acquisition would result in $30 million cost synergies by the end of Symantec's fiscal year 2018 and would increase to over $80 million by the end of fiscal year 2020.

### B.   Defendants Manipulated the Company's Financial Metrics

47.   To meet the lofty promises of the "transformational" acquisitions and to meet executive compensation targets, Defendants manipulated the Company's revenue and operating income metrics.  First, Defendants overstated GAAP and non-GAAP revenue by improperly recognizing revenue, including revenue that should have been deferred, in violation of GAAP. Second, Defendants improperly recorded operating expenses incurred in the ordinary course of business as "transition costs" and adjusted those costs to overstate non-GAAP operating income.

#### 1.   Defendants Caused the Company to Improperly Recognize Revenue

##### a.   Applicable Accounting Principles

48.   GAAP is the set of standardized rules used to prepare financial statements.  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. Part 210) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

49.  Under GAAP, revenue is recognized when certain criteria are met and in the period when those criteria are met.  Accrual accounting, a method that records revenues when earned and expenses when incurred, aims "to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances" using the "matching principle," which matches revenue to the period to which it relates.  Financial Accounting Standards Board Concepts Statement ("FASCON") No. 6. Symantec uses the accrual accounting method.

50.  Accounting Standards Codification ("ASC") 605-10-25-1 provides that revenue may be recognized when it is realized or realizable and earned.  ASC Topic 605 provides, in relevant part: "Revenue and gains are realized when products (goods or services), merchandise or other assets are exchanged for cash or claims to cash. . . .  [R]evenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash."  Additionally, ASC Topic 605 states:

> Revenue is not recognized until earned. . . . [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by revenues.

51.  ASC 985-605-25-3, Software Not Requiring Significant Production, Modification, or Customization, establishes basic revenue recognition criteria for software licenses.  ASC 985- 26605-25-3 provides:

> If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:
>
> a.  Persuasive evidence of an arrangement exists;
>
> b.  Delivery has occurred;

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

  c.  The vendor's fee is fixed or determinable; and

  d.  Collectability is probable.

  52.  With respect to subpart (a), ASC 605-25-16 further states:

> If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization). If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.

  53.  ASC 958-605-25-21 further reiterates with regard to customer acceptance, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."

  54.  With regard to Subpart 3(d), whether collectability is probable, ASC 985-605-25-34 provides that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

  55.  Symantec's revenue recognition policy provides, among other things: "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

  56.  The Company's independent accounting firm, KPMG LLP ("KPMG"), issued guidance regarding Revenue from Contracts with Customers: "Under current SEC guidance, if an entity's customary business practice is to have, in addition to meeting the other criteria, a contract signed by both parties before it concludes that persuasive evidence of an arrangement exists, the entity does not recognize revenue until a written sales agreement is finalized–including being signed by both the customer and the entity . . . ." The same KPMG guidance states, "Under current SEC guidance and U.S. GAAP for software entities, consideration in a contract has to be fixed or determinable in order for the entity to recognize revenue."

  57.  Accordingly, under GAAP and Symantec's revenue recognition policy, and consistent with the guidance provided by Symantec's auditor, revenues must not be recognized (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or

11

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.

58.     Deferred revenue, or payments that a company receives for products or services that are to be delivered or performed in the future, is a liability.  Deferred revenue is recorded when a company bills a customer before satisfying GAAP's revenue recognition criteria. Recognizing deferred revenue that is not realized, or not realizable and earned, violates GAAP.

### b.     Defendants Improperly Recognized Revenue to Achieve the Target Numbers for a Given Period

59.     As set forth in the Consolidated Class Action Complaint filed by the plaintiffs in the Securities Class Action, Defendants violated GAAP by recognizing revenue at period-end on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.  The allegations in ¶¶ 60-68, 81-82, *infra*, are based on the allegations of the Consolidated Class Action Complaint in the Securities Class Action.

60.     Upon information and belief, defendant Clark regularly discussed that the hardware business enabled the flexibility to shift and/or to spread out revenue over time and that Blue Coat had the ability to "massage" revenue over time.  Defendant Clark frequently discussed "opportunities" to manipulate or to adjust revenue by various periods or by a year.  For example, if the Company had already achieved its target for a particular quarter, then management would not deliver and record revenue until the next quarter.

61.     Upon information and belief, the Officer Defendants caused the Company to accelerate revenue recognition by shifting the Company from a subscription model to a licensing model, which would enable them to recognize revenue upfront rather than deferring it over several periods.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

62.     Upon information and belief, the Officer Defendants caused the Company to recognize revenue on contracts that did not meet the Company's own accounting policies.   To increase revenue for a given reporting period, the Officer Defendants caused the Company to recognize revenue on contracts at the end of the quarter for which they knew the orders would not be processed or on contracts that were not signed.   The next quarter, the Officer Defendants would cause the Company to back out the orders.

63.     Moreover, upon information and belief, the Officer Defendants would accelerate multi-million dollar deals by two or three quarters to meet the target numbers for the quarter, even though the customers had not undergone a thorough credit check.   For example, in January 2016, a deal worth approximately $6 million was recognized two to three quarters ahead of time to meet the numbers for the fiscal year ending April 1, 2016.

64.     Upon information and belief, the Officer Defendants caused the Company to offer incentives, such as free security certifications, or favorable payment options, such as extended terms, to customers who were reluctant to sign.   The Finance Department either did not pre-approve, or was pressured by the Officer Defendants to approve, the financing options offered to such customers.

65.     Upon information and belief, the Officer Defendants discounted deferred revenue from the Watchful Software Acquisition, which included several years of maintenance revenue, and recognized it upfront to boost numbers for the current period even though the revenue would be earned over time.   The Officer Defendants stopped recording deferred revenue and instead recognized the contracts as revenue.

66.     Upon information and belief, defendant Garfield ultimately left the Company because he was unwilling to continue the improper revenue recognition practices, but only after he signed off on the books for the 2017 financial year in exchange for a financial package.

67.     Upon information and belief, the Officer Defendants caused the Company to push deals to subsequent quarters on at least five occasions.   For example, a senior executive at Symantec who had worked for Blue Coat improperly circumvented the Company's approval

process and offered a $1 million discount to one of his contacts at Verizon as an incentive to close a $13 million deal at the end of Q4 2017.  The deal was booked for Q1 2018, even though it had closed in Q4 2017, and was booked to include products that were not part of the deal.  The unauthorized discount impacted the Company's run rate, which must stay above a certain level under applicable accounting rules.  The motive for the decision to book the Verizon deal in Q1 2018 instead of Q4 2017 is that during Q4 2017, the Board changed the metric for the fiscal 2017 PRU grants from non-GAAP operating income margin for fiscal 2017 to non-GAAP operating income for fiscal 2018.

68.     Upon information and belief, the Officer Defendants urged the Company's account managers to make verbal agreements with customers, even though such side agreements would violate the Symantec's compliance policies.

## 2.     Defendants Manipulated Reported Transition Costs

### a.     Applicable Regulations

69.     "Non-GAAP" financial measures present an adjusted picture of the company's past or future financial performance.  These adjusted financial measures typically remove the effect of certain revenues and expenses that may be non-recurring or not part of the company's core operations.

70.     Symantec reported non-GAAP financial measures in its earnings press releases and financial statements.

71.     Due to companies' increased reliance on adjusted metrics, the SEC has issued rules, regulations, and guidance that apply when a company publicly discloses or releases financial information that includes an adjusted measure.  Among others, Regulation G (17 C.F.R.24 § 244.100), which applies to the disclosure of adjusted measures, prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact.  17 C.F.R. § 244.100(b) provides:

> A registrant, or a person acting on its behalf, ***shall not make public a non-GAAP financial measure that***, taken together with the information accompanying that measure and any other accompanying discussion of that measure, ***contains an untrue statement of a material fact or omits to state***

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading*.

(Emphasis added.)

72.     SEC Regulation S-K, Item 10 (17 C.F.R. § 229.10) further prohibits a company from filing with the SEC an adjusted measure that adds back expenses that are related to the Company's ordinary course of business (i.e., recurring). 17 C.F.R. § 229.10(e)(1)(ii)(B), provides:

> A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is *reasonably likely to recur within two years or there was a similar charge or gain within the prior two years*.

(Emphasis added.)

73.     The SEC also publishes Compliance & Disclosure Interpretations ("C&DIs") containing questions and answers relating to adjusted financial measures. Question and Answer 100.01 provides:

> **Question**: Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?
>
> **Answer**: Yes. *Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading*. For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.

(Emphasis added.)

74.     It is thus a violation of SEC Regulation G and Regulation S-K for a company to report adjusted financial measures that are misleading, omit to state a material fact necessary to make them not misleading, and/or exclude expenses in an adjusted measure that are related to the company's ordinary course of business.

75.     In addition, the SEC's Division of Corporate Finance published the following excerpt addressing the disclosure of adjusted financial measures: "If management is presenting the non-GAAP calculation as an alternative or pro forma measure of performance, the staff

15

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual." For example, it would be misleading for a company to exclude rent because it is an ongoing expense. As relevant here and detailed further in Section VI below, Symantec improperly excluded ongoing consulting charges and other continuing costs from its adjusted measures, rendering those stated metrics misleading and in violation of SEC Regulations G and S-K.

               **b.**     **Defendants Inflated Symantec's Non-GAAP Financial Metrics**

        76.     Symantec's non-GAAP revenue is its reported GAAP revenue, adjusted for deferred revenue that had been written down in connection with Symantec's acquisitions (referred to as the "deferred revenue fair value adjustment"). As set forth herein, Defendants inflated reported GAAP revenue, which in turn manipulated the Company's reported non-GAAP revenue.

        77.     Symantec's non-GAAP operating income is its operating income less its adjusted operating expenses. The Company adjusted its expenses to remove "transition costs," which are costs not incurred "in the ordinary course of business." The Defendants caused the Company to issue public statements representing that Symantec reported non-GAAP financial measures, excluding charges such as transition costs, "to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

        78.     However, Defendants improperly characterized recurring expenses incurred in the ordinary course of business, such as general and administrative expenses, as "transition costs." The Defendants acknowledged in the Company's 2017 Form 10-K, which was signed by defendants Clark, Noviello, Garfield, Schulman, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Unruh, and Vautrinot, that "transition costs" were actually recurring items: "we expect continuing significant transition costs associated with the implementation of a new enterprise resource planning system" and "we incurred $94 million in continuing operations transition expense."

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

79.    Moreover, the Defendants inflated transition costs even after they were reported. For Q1 2018, the Defendants caused the Company to file a Form 10-Q with the SEC on August 4, 2017 that identified $28 million in transition costs.  For Q2 2018, the Defendants caused the Company to file a Form 10-Q with the SEC on November 3, 2017 that reported $76 million in transition costs and that the Company had actually incurred $44 million in transition costs in Q1 2018—a difference of $16 million from the previously-reported number—resulting in $120 million transition costs over the prior two quarters.

80.    On October 28, 2018, the Defendants caused the Company to file its Form 10-K with the SEC that reported $272 million in transition costs for fiscal year 2018, a 200% increase over the prior year for which the Company reported $94 million transition costs.

81.    Upon information and belief, the Officer Defendants caused the Company to frequently and aggressively classify projects for the ordinary course of business, such as enterprise resource planning, significant cloud infrastructure, and security, as "transformational" to maintain operational budget.  The Officer Defendants exerted significant pressure on lower level employees to coerce them to reclassify costs.  Up to tens of millions of dollars for such projects, including the associated labor costs, were reclassified as transformational costs, thus allowing the Officer Defendants to claim they were non-recurring transition costs excluded from non-GAAP operating income.  This practice allowed the Company to complete projects that otherwise did not fit the operational budget and to spread the costs over time.

82.    Because transition costs are understood as one-time events, this mischaracterization impacts the public's perception of the Company's operations.  Additionally, by classifying certain operational expenses as "transition costs," such as the costs associated with the implementation of internal cloud-based software, the Officer Defendants were able to strategically capitalize these costs over a period of time, rather than record them as expenses when they were incurred as required.  Therefore, costs for recurring projects incrementally impacted the Company's operational budget over time, and in turn the Company's financial metrics, rather than impacting the current period entirely.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

83.     Characterizing recurring expenses as transition costs violates SEC rules and regulations that prohibit adjustments to "eliminate or smooth items characterized as nonrecurring, infrequent or unusual."  Moreover, SEC Regulation S-K specifically prohibits a company from filing with the SEC a non-GAAP measure that adds back expenses that are related to the ordinary course of business.

84.     Adjusted revenue and adjusted operating income, both of which Defendants manipulated, impacted other reported metrics.  Adjusted operating margin, which measures profitability, is the quotient of operating income and revenue. Adjusted EPS, which reflects the profit allocable to each share of common stock, depends on operating income (i.e., EPS = Operating Income – Preferred Dividends / Weighted Average Common Shares).  Therefore, Defendants caused the Company to issue misleading adjusted operating margin and adjusted EPS.

**C.     The Defendants Knowingly Caused the Company to Issue Misleading Statements**

85.     ██████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████

86.     ██████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

87.

88.

89.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

90. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

91. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

92. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

93. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

94.

95.

96.

97.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

98.

99.

100.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



101.

102.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

(Emphasis added.)

103. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████

104.    On May 10, 2017, the Defendants caused Symantec to issue a press release announcing its fourth quarter and fiscal year 2017 results, which stated: "Q4 GAAP revenue $1.115 billion, up 28% year over year"; "Fiscal Year 2017 (FY17) GAAP revenue $4.019 billion, up 12% year over year"; "Q4 Enterprise Security segment GAAP revenue up 40%; [and] FY17 Enterprise Security segment GAAP revenue up 22%."

105.    In the press release, defendant Clark specifically attributed the Company's revenue growth to the successful integration of Blue Coat: "***The industrial logic of combining Symantec and Blue Coat is proving out***, with Enterprise Security growing organically year over year and Blue Coat cloud subscription revenue growing 67%. . . .***We are on-track to deliver long-term, sustainable growth and industry-leading profitability as the new Symantec***."

106. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

24

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

107. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████.

108. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████

109.    On August 2, 2017, the Defendants caused Symantec to issue a press release announcing its first quarter 2018 results, which stated: "Q1 GAAP revenue $1.175 billion, up 33% year over year."

110. ████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

111.    On August 4, 2017, the Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017, which stated: "Revenue increased by 33%, driven by a 34% and 31% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock')."

112.    On August 16, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on October 5, 2017.  In the proxy statement, these eleven defendants solicited stockholder votes in favor of five management proposals, including: (i) a proposal to elect Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot to new terms as directors; and (ii) a proposal to approve an amendment, among others, to the Company's 2013 Equity Incentive Plan to increase the number of shares reserved for issuance thereunder by 8 million shares.

113.    The 2017 proxy statement disclosed that the Board had determined that Clark was not an independent director.  Regarding corporate governance, the proxy statement stated that "the Board is responsible for the general governance of our company, including selection and oversight of key management; and management is responsible for running our day-to-day operations."  According to the proxy statement, the Board maintained an Audit Committee tasked with oversight of, among other things, the Company's accounting and financial reporting:

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Audit Committee**

Our Audit Committee oversees our company's accounting and financial reporting processes and the audits of our financial statements, including oversight of our systems of internal controls and disclosure controls and procedures, compliance with legal and regulatory requirements, internal audit function and the appointment, retention and compensation of our independent auditors. Its duties and responsibilities include, among other things, to:

- Review our company's quarterly and annual financial statements.
- Review the adequacy and effectiveness of our company's accounting and financial reporting processes.
- Appoint and, if necessary, terminate any registered public accounting firm engaged to render an audit report or to perform other audit, review or attest services for our company.
- Review and approve processes and procedures to ensure the continuing independence of our company's independent auditors.
- Review the internal audit function of our company, including the independence and authority of its reporting obligations and the coordination of our company's internal audit function with the independent auditors.
- Review our company's practices with respect to risk assessment and risk management and meet with management and members of internal audit to discuss our company's significant risk exposures and the steps management has taken to monitor, control and mitigate such exposures.
- Review our company's ethics compliance program, including policies and procedures for monitoring compliance, and the implementation and effectiveness of our company's ethics and compliance program.

114. The proxy statement disclosed: "Executive Annual Incentive Plan [("AIP")] targets are established within the first 90 days of each plan year." Because Symantec's fiscal year begins in March, the incentive compensation targets are normally set by the end of June.

115. According to the proxy statement, the Board used non-GAAP operating income and non-GAAP revenue to establish incentive compensation targets under the AIP: At the end of each fiscal year, the Compensation Committee reviews actual performance against the AIP targets "after making any appropriate adjustments to such measures for the effects of corporate events that were not anticipated in establishing the performance measures."

116. The proxy statement disclosed the following tables regarding the regarding the 2017 targets:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



117.    According to the proxy statement, the "actual" results used to determine AIP payout were:

|  | Target ($)(millions) | Actual ($) (millions) | Achievement (%) | Funding (%) |
|---|---|---|---|---|
| Operating Income | 1,143 | 1,197 | 104.7 | 125.8 |
| Revenue | 4,040 - 4,120 | 4,086 | 100 | 100.0 |
| Fiscal 2017 Funding |  |  |  | 111.5 |

118.    The above chart and the proxy statement indicate that the target did not account for the impact of the LifeLock, Inc. ("LifeLock") on 2017 non-GAAP revenue and non-GAAP operating income.  According to the Company's 2017 Form 10-K, the impact of LifeLock is as follows:

> Our results of continuing operations for fiscal 2017 include $72 million and $98 million, respectively, of net revenues and a pre-tax loss attributable to LifeLock beginning February 9, 2017…. Transaction costs of $21 million incurred by Symantec in connection with the LifeLock acquisition are included in operating expenses in our Consolidated Statements of Operations for fiscal 2017.

119.    The Company applied a $28 million deferred revenue fair value adjustment to the LifeLock segment.  Accordingly, the non-GAAP LifeLock revenue was $100 million, comprised of $72 million GAAP revenue and a non-GAAP adjustment of $28 million.

120.    In 2017, the Company's reported non-GAAP revenue was $4,163 million but the adjusted revenue number used for the AIPs was $4,086 million, representing a $77 million downward adjustment.    At the adjusted non-GAAP revenue number of $4,086 million, Symantec's executives achieved 100% funding for the revenue metric.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

121.    Plaintiff infers that the $77 million downward adjustment is comprised of the $72 million LifeLock GAAP revenue plus an additional $5 million the source of which is undisclosed.  Clearly the $100 million non-GAAP LifeLock revenues should have been deducted from the $4,163 million of non-GAAP revenue for the purposes of evaluating achievement of incentive compensation targets.  Accordingly, the starting point for the "actual" non-GAAP revenue should have been $4,063 million.  The $116 million of deferred revenue non-GAAP adjustments for Blue Coat were above the anticipated $103 million or less, and so was not anticipated by the Compensation Committee when the targets were set.  Accordingly, the "actual" revenue number should have actually been below the $4,040 million threshold.

122.    Had the "appropriate adjustment" been $124 million or greater, the funding for the revenue metric of the AIPs would have been zero as opposed to 100%.  Similarly, an upward adjustment of $3 million was applied to reported non-GAAP operating income in order to reach funding under that metric of 125%.  Had the "appropriate adjustment" to non-GAAP operating income been $53 million or more downward, funding under this metric would have been zero as opposed to 125%.

123.    Additionally, the 2017 proxy disclosed that:

The Compensation Committee originally established a target for non-GAAP operating income margin in fiscal 2017 under the fiscal 2017 PRU grants. In evaluating the financial impact of the Blue Coat acquisition, the LifeLock acquisition, as well as the new financial plans for the combined company for fiscal 2018, our Compensation Committee changed the metric under the fiscal 2017 PRU grants from non-GAAP operating income margin to non-GAAP operating income, and established a non-GAAP operating income target for the subsequent fiscal year measurement period, fiscal 2018. For purposes of calculating performance under the PRUs, we define non-GAAP operating income as our fiscal 2018 non-GAAP operating income reported as part of our earnings release…

124.    The decision to measure PRU grants on the subsequent year's results departed from the Company's past practice.  According to the proxy statements filed by Symantec in 2014, 2015, and 2016, "our executive officers our executive officers were eligible to receive shares… based upon (i) our achievement of annual non-GAAP [metric] for the first fiscal year

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

covered by the award…."  That is, for example, the 2016 award is based on the achievement of the annual metric for 2016, the 2015 award is based on achievement of the annual metric for 2015, and so on.

125.    The ratios of the relative subjective "restructuring, separation, transition and other" non-GAAP adjustments to non-GAAP revenue and non-GAAP operating expenses were each 4% in 2016.  During 2017 those ratios increased to 7%.  Plaintiff infers that the significant increase in this ratio was due to manipulation in order to attain incentive compensation targets.

126.    Further, due to the incentives created by the decision to change the fiscal year evaluated for PRU targets, these ratios continued to increase during 2018 to approximately 8% - 9%.  Indeed, in the fourth quarter of 2018, the ratio reached 11%, nearly triple the pre-acquisition amount.

127.    Supporting plaintiff's inference of manipulation is that Symantec's 2017 Form 10-K stated that the Company expected to incur "approximately $240 million to $290 million" in connection with the Company's restructuring plan.    However, the 2018 "restructuring, separation, transition, and other" non-GAAP adjustment was $417 million.

128.    Additionally, during 2017, the target metric for PRUs was non-GAAP operating margin.    The specific threshold to achieve payout of the PRUs was not disclosed.

129.    The Company's 2017 proxy statement demonstrates that in 2017: (i) that the Board's process for setting incentive compensation targets departed sharply from past practice; (ii) with respect to award of the PRUs, the Board belatedly changed the financial metrics used as

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

targets in ways that increased the payouts to the Officer Defendants; and (iii) the Board decided to change the *year* during which the results were to be achieved such that 2017 incentive compensation would be evaluated against 2018 results.

130. Due to the change in PRU metric, the full year 2018 non-GAAP operating income became relevant to 2017 PRU eligibility. As a result, there is an incentive to manipulate the 2018 non-GAAP adjustments in order to become eligible for the 2017 PRUs.

131. The 2017 proxy statement solicited shareholder approval of an amendment to the 2013 Equity Incentive Plan to increase the number of shares of common stock reserved for issuance thereunder by 8 million shares. If approved, the total number of shares reserved for issuance would be 70 million shares, which represents 11.3% of the Company's outstanding as of July 19, 2017.

132. The 2017 proxy statement was materially misleading for the following reasons: a) it concealed that the non-GAAP revenue and operating income metrics used to award executive incentive compensation had been artificially inflated by improper adjustments; and b) had the appropriate adjustments been applied, the funding for incentive awards under the non-GAAP revenue and operating income metrics would have been zero, as opposed to 100% and 125%, respectively.

133. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

134. On October 6, 2017, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2017 proxy statement. In particular, the

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

amendments to the Company's 2013 Equity Incentive Plan were approved. The misleading disclosures and concealment of artificially inflated incentive compensation in the proxy statement were fundamental to the shareholder approval of the amendments to the 2013 Equity Incentive Plan. As a result of the misleading statements and omissions, the Company was harmed by the issuance of stock for incentive compensation when the Company's financial performance was being artificially and improperly inflated.

135. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

136. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

137.   On November 1, 2017, the Defendants caused Symantec to issue a press release announcing its second quarter 2018 financial results, which stated: "Q2 GAAP revenue $1.240 billion, up 27% year over year."

138.   On November 3, 2017, the Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended September 29, 2017, which stated: "Revenue increased by 27%, driven by a 20% and 37% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, ***primarily due to the contributions from the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock'), respectively***." (Emphasis added.)

139.   Neither the Form 10-Q nor the earnings release filed on November 1, 2017 disclosed ████████████

140.   ██████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

141. █████████████████████████████████████████████
███████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████

142. █████████████████████████████████████████████
████████████████████████████████████

When conducting internal development of intangible assets, accounting rules
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████

█████████████████████

███████████████████████████████████████████
████████████

███████████████████████████████████
████████████████████████████
████
████████████████████████████████████████████
████████████
████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



(Emphasis added.)

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

146.

147.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

148. ███████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████

149.   On January 31, 2018, the Defendants caused Symantec to issue a press release announcing its third quarter 2018 financial results, which stated: "Q3 GAAP revenue $1.209 billion, up 16% year-over-year."

150.   On February 2, 2018, the Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended December 29, 2017, which stated: "Revenue increased by 25% compared to the corresponding period in the prior year, driven by a 15% and 38% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the contributions from the acquisitions of Blue Coat and LifeLock."

**VII.   The Truth Begins to Emerge**

151.   On May 10, 2018, the Defendants caused Symantec to issue a press release announcing its fiscal fourth quarter 2018 earnings, in which it disclosed that the Audit Committee had commenced an internal investigation due to concerns raised by a former employee.  The press release also stated that the Company retained independent counsel and other advisors to assist with the investigation and that the Company had voluntarily contacted the SEC and would provide additional information to the SEC as the investigation proceeded.  As a result of the ongoing investigations, the press release qualified the reported results by stating that the "financial results and guidance may be subject to change" and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

152.    In appendix A of the press release, which was concurrently filed with the SEC, the Defendants no longer described "transition costs" as "continuing."  Instead, the Defendants attempted to justify the removal of such transition costs in calculating the Company's adjusted operating income:  "We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance."

153.    The same day, Symantec held a conference call with investors during which Defendant Noviello "forecast[] year-over-year decline in Enterprise Security revenue [and flat year-over-year revenue for the total company that was] primarily attributed to a lower mix of business yielding in-period revenue and other contributors, including increased contract duration and timing of maintenance renewals."

154.    On this news, the Company's stock price fell $9.66 per share, or more than 33%, to close at $19.52 per share on May 11, 2018.

155.    On May 14, 2018, the Defendants caused Symantec to release an updated statement regarding the Audit Committee's ongoing internal investigation:

> The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee regarding the Company's public disclosures including commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation. The Audit Committee has retained independent counsel and other advisors to assist it in its investigation. The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds. The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation. The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner. At this time, the Company does not anticipate a material adverse impact on its historical financial statements.

156.    The same day, Symantec hosted a conference call with investors to provide "more information" about the internal investigation and the Company's fiscal year 2019 financial

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

guidance and fiscal year 2020 financial outlook.  During the call, Clark stated that: "For anyone concerned about executive compensation at this time, I want to let you know that all discretionary and performance-based compensation for named executive officers is on hold pending the outcome of the Audit Committee investigation."  Defendant Noviello stated that during the investigation, the Company would not repurchase any shares.  When asked by a financial analyst to confirm that the Company did not anticipate any material adverse impact to its financials, Clark could not so confirm.

157.    On May 14, 2018, *Probes Reporter* published an article alleging that the SEC had been investigating Symantec as early as April 17, 2018—contradicting the Defendants' claims that they had voluntarily contacted the SEC regarding the whistleblower's expressed concerns. The *Probes Reporter* published a letter dated April 17, 2018 that it had received from the SEC in response to a request for information concerning Symantec pursuant to the Freedom of Information Act.  In the letter, the SEC denied the request, explaining that it was withholding the information requested under federal exemptions protecting from disclosure records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities.

158.    On May 15, 2018, Paulo Santos ("Santos"), an analyst, wrote on *Seeking Alpha* that, given the recent disclosures, "[t]here's a good chance Symantec will find a level of exaggeration in the previously-used non-GAAP adjustments," including for recurring operating costs.[1]  Santos added:

> If Symantec finds that some non-GAAP adjustments were indeed not called for, their removal will still have consequences.  When you look at Symantec's earnings estimates, those are based on Symantec's non-GAAP reporting.  Were Symantec to remove some of those non-GAAP adjustments, and immediately it would start reporting lower non-GAAP earnings.  Even with no change to its historical financial statements and accounting practices. . . . Symantec was always

---

[1]     Paulo Santos, *Symantec: Parsing the Details*, Seeking Alpha (May 15, 2018), *available at* https://seekingalpha.com/article/4174098-symantec-parsing-details.

pretty expensive (for a stagnated business) when it came to GAAP measures, and only the non-GAAP adjustments made it look more reasonable.[2]

159.    On May 31, 2018, the Defendants caused Symantec to announce that the Company had received a deficiency notice "from NASDAQ stating that, as a result of failing to timely file its annual report on Form 10-K for the year ended March 30, 2018, Symantec was not in compliance with NASDAQ [listing rules]."

160.    On May 31, 2018, Credit Suisse analyst Brad Zelnick issued a report summarizing opinions of Ron Kiima, former assistant chief accountant for the SEC, who believed the investigation concerned the Company's non-GAAP adjustments, including those relating to restructuring, transition or other costs removed from Symantec's reported adjusted metrics.

161.    On August 2, 2018, the Defendants caused Symantec to issue a press release announcing its first quarter 2019 financial results. The press release stated that, since the Audit Committee investigation remained ongoing, "fourth quarter of fiscal year 2018 and subsequent periods remain open periods from an accounting perspective, subject to adjustment for material updates."  Moreover, the Defendants attributed implied billings, which were below expectations, "to longer than expected sales cycles for large multi-product platform sales[, an] issue isolated to North America."  The Defendants also lowered revenue guidance for fiscal 2019 to a range of $4.64 billion to $4.76 billion, which fell short of median analyst estimates of $4.84 billion.

162.    On this news, the Company's stock price fell $1.63 per share, or nearly 8%, to close at $19.25 per share on August 3, 2018.

163.    On August 3, 2018, William Fitzsimmons of Morningstar Equity Research issued a report stating that, after "scour[ing] Symantec's financial results for irregularities . . . investors should be aware of the two speculative theories that could have triggered the audit":

> [W]e've noticed an expansion in the spread between both GAAP and non-GAAP results.  It seems the restructuring line item of its income statement has increased, and it could be in the realm of possibility that management may have inflated restructuring expenses, by placing expenses that would have typically been regular operating expenses into this line item.  Whether an expense falls in the restructuring line item versus regular operating expense (S&M, R&D, or G&A)

---

[2]     *Id.*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

has no bearing on GAAP profitability, but when calculating non-GAAP Net Income, restructuring expenses are added back into the results. Thus, it is within the realm of possibility that management inflated the restructuring line item to produce a better-looking non-GAAP EPS metric, allowing the firm to hit stock-based compensation targets.

## VIII.   The Truth Fully Emerges

164.   On September 24, 2018, the Defendants caused Symantec to announce that its Audit Committee, independent legal counsel, and a forensic accounting firm, had concluded their internal investigation into Symantec's accounting practices.  The press release also disclosed that the SEC had commenced a formal investigation into Symantec's accounting.

165.   The press release stated that the Company had recognized revenue in Q1 2018 and Q1 2019 that should have been deferred and that those financial statements would be restated accordingly:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period). After subsequent review of the transaction, the Company has concluded that *$12 million of the $13 million should be deferred*. Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) *will be revised to take into account this deferral and any other financial adjustments required as a result of this revision*.

(Emphasis added.)

166.   The press release announced a massive corporate reshuffling and the need for improvements to its internal controls:

> The Audit Committee noted relatively *weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses*.  The Audit Committee also observed that beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures.
>
> * * *
>
> The Audit Committee also reviewed certain allegations concerning, and identified certain behavior inconsistent with, the Company's Code of Conduct and related policies. The Audit Committee referred these matters to the Company for, and the Company intends to take, appropriate action.

41

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

The Audit Committee proposed certain recommendations which the Board of Directors has adopted, including: appointing a separate Chief Accounting Officer; appointing a separate Chief Compliance Officer reporting to the Audit Committee; clarifying and enhancing the Code of Conduct and related policies; *and adopting certain enhanced controls and policies related to the matters investigated*.

(Emphasis added.)

## IX.  Defendants Breached Their Fiduciary Duties by Insider Stock Sales at Inflated Prices and Received Excessive Executive Compensation

### A.  Clark, Noviello, Garfield, Sands, and Vautrinot Sold Over $20 Million in Symantec Stock While in Possession of Material Non-Public Information

Noviello

167.  Defendant Noviello is the Company's Chief Financial Officer with a highly sophisticated understanding of the Company's results and their import.

168.  As set forth herein, as early as August 2016, defendant Noviello possessed material negative information which he knew was being concealed from investors.  Defendant Noviello consciously acted to exploit his knowledge by selling over $12.89 million of Symantec stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/15/2017 | 27,741 | $32.45 | $900,154 |
| 7/12/2017 | 10,034 | $30.00 | $301,020 |
| 8/28/2017 | 14,925 | $30.00 | $447,750 |
| 9/7/2017 | 7,688 | $30.00 | $230,640 |
| 11/6/2017 | 375,000 | $29.38 | $11,018,400 |
| | 435,388 | | $12,897,964 |

169.  Defendant Noviello thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Clark

170.  Defendant Clark is the Company's Chief Executive Officer with a highly sophisticated understanding of the Company's results and their import.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

171.    As set forth herein, as early as August 2016, defendant Clark possessed material negative information which he knew was being concealed from investors.  Defendant Clark consciously acted to exploit his knowledge by selling 200,000 shares of Symantec stock between August 28 and 31, 2017 at $30.00 for a combined benefit of approximately $6 million.

172.    Defendant Clark thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Garfield

173.    Defendant Garfield was the Company's Chief Accounting Officer with a highly sophisticated understanding of the Company's results and their import.

174.    As set forth herein, as early as August 2016, defendant Garfield possessed material negative information which he knew was being concealed from investors.  Defendant Garfield consciously acted to exploit his knowledge by selling 29,466 shares of Symantec stock between May 23 and June 2, 2017 at prices between $29.39 and $30.06 for a combined benefit of $873,657.

175.    Defendant Garfield thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Sands and Vautrinot

176.    Defendants Sands and Vautrinot serve as directors of the Company and members of the Audit Committee.

177.    As set forth herein, as early as August 2016, defendants Sands and Vautrinot possessed material negative information which they knew was being concealed from investors.

178.    Defendant Sands consciously acted to exploit her knowledge by selling $247,816 worth of Symantec stock to her substantial benefit as follows:

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

| Date | Shares Sold | Prices per Share | Proceeds |
|------|-------------|------------------|----------|
| 7/12/2017 | 2,000 | $30.00 | $60,000 |
| 7/17/2017 | 2,000 | $30.40 | $60,000 |
| 8/28/2017 | 2,000 | $30.00 | $60,000 |
| 9/18/2017 | 2,000 | $33.51 | $67,016 |
| | 8,000 | | **$247,816** |

179.    Defendant Vautrinot consciously acted to exploit her knowledge by selling $247,816 worth of Symantec stock to her substantial benefit as follows:

| Date | Shares Sold | Prices per Share | Proceeds |
|------|-------------|------------------|----------|
| 7/3/2017 | 2,500 | $28.45 | $71,125 |
| 10/2/2017 | 2,500 | $32.81 | $82,025 |
| 3/9/2018 | 4,000 | $27.72 | $110,880 |
| | 9,000 | | **$264,030** |

180.    Defendants Sands and Vautrinot thus used their fiduciary position to enrich themselves and failed to discharge their fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

**B.    Defendants Clark and Noviello Received Substantial Incentive Compensation Based on Artificially Inflated Non-GAAP Measures**

181.    The 2017 proxy statement described the Company's Executive Annual Incentive Plan. Management proposes, and the Compensation Committee approves, performance targets typically within the first 90 days of each plan year.  However, after the Blue Coat acquisition, "the Compensation Committee approved revised goals in December 2016 that reflected the integrated business objectives, while also reducing the potential upside in the plan relative to prior years (to 150% of target from 200%) given the relatively short period of time for performance to be delivered."

182.    According to the proxy statement, defendants Clark and Noviello received compensation based on the Company's performance measured by 2017 non-GAAP operating income (target level of $1.143 billion) and 2017 non-GAAP revenue (target range of $4.04 to

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

$4.12 billion).  If the non-GAAP metrics were below the target levels, then the executives were not awarded any incentive award compensation. Moreover:

      a.    For non-GAAP operating income: (a) at the threshold achievement level of 95.4% of target, the funding level is 50%; (b) above the threshold achievement level, the funding level increases incrementally, up to a funding level of 100% at a target achievement level of 100%; (c) above the target achievement level, funding increases incrementally, up to a cap of a 150% funding based on a maximum achievement level of at least 109.1% of target.

      b.    For non-GAAP revenue, the Compensation Committee established a target achievement range of $4.04 billion to $4.12 billion, where: (a) the funding level is 100% for the achievement of the levels between this range; (b) below the threshold achievement level of $4.04 billion, the funding level is 0%; and (c) above the $4.12 billion achievement level, funding increases incrementally, up to a cap of a 150% funding based on a maximum achievement level of at $4.162 billion. The targets for and achievement of non-GAAP operating income and revenue were normalized to exclude the financial impact of the LifeLock acquisition as it was not completed until near the end of our fiscal year (February 2017).

183.    For fiscal year 2017, which ended March 31, 2017, the Compensation Committee represented that the Company achieved $1.197 billion non-GAAP operating income (i.e., 104.7% of target, resulting in 125.8% funding) and $4.086 billion non-GAAP revenue (i.e., 100% of target, resulting in 100% funding).   As a result, the Compensation Committee approved a payout of 111.5% for fiscal 2017, and Defendant Clark received $743,333 and Defendant Noviello received $479,673 in bonus cash compensation.

184.    The improper classification of certain expenses as "transition costs" was crucial to defendants' executive compensation.  The difference between the reported non-GAAP operating income and the threshold to receive any bonus compensation is $107 million.   Notably, "transition costs" for fiscal year 2017 was $94 million, or 87.9% of the $107 million difference necessary to receive bonus compensation.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

185.    In addition to cash incentives, Defendants Clark and Noviello also received equity incentive awards under their fiscal year 2017 executive compensation plan, including Performance-based Restricted Stock Units ("PRUs").   The 2017 proxy statement stated that metrics for 2017 PRU grants were adjusted after the Blue Coat and LifeLock acquisitions:

> The Compensation Committee originally established a target for non-GAAP operating income margin in fiscal 2017 under the fiscal 2017 PRU grants. In evaluating the financial impact of the Blue Coat acquisition, the LifeLock acquisition, as well as the new financial plans for the combined company for fiscal 2018, *our Compensation Committee changed the metric under the fiscal 2017 PRU grants from non-GAAP operating income margin to non-GAAP operating income, and established a non-GAAP operating income target for the subsequent fiscal year measurement period, fiscal 2018.* For purposes of calculating performance under the PRUs, *we define non-GAAP operating income as our fiscal 2018 non-GAAP operating income reported as part of our earnings release, as adjusted for any positive or negative foreign exchange impacts (subject to cap on negative impacts to revenue of up to $91 million),* plus the aggregate pre-tax dollar value of the benefit to non-GAAP EPS in the period from any capital structure changes, such as cash interest expense savings due to prepayment of indebtedness. *We have not disclosed the specific target for non-GAAP operating income for fiscal 2018 as that internal target is highly confidential and not reported publicly.* Disclosing the specific non-GAAP operating income target would provide competitors and third parties with insights into the Company's internal planning processes which might allow our competitors to predict certain business strategies and cause us competitive harm.

(Emphasis added.)

186.    According to the Company's Form 10-K for fiscal 2018, the non-GAAP operating income target for fiscal 2017 PRUs was $1.56 billion.  The 10-K further stated that the Company achieved $1.705 billion in adjusted non-GAAP operating income, or $109.29% of target level. As a result, executives would receive 268.2% of target payout, of which 250% would be earned and vested at the end of fiscal 2018.  The remaining 18.2% is eligible to be earned at the end of fiscal 2019, provided the executive is employed by Symantec through the end of fiscal 2019.

187.    Thus, as set forth in the table below, defendant Clark received a total of over *$41.5 million* in Symantec stock at the end of fiscal year 2018 and is eligible to receive an additional $3 million in Symantec shares at the end of fiscal year 2019 under the FY 2017 PRUs plan.  Defendant Noviello received nearly $10.5 million in Symantec stock at the end of fiscal

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

year 2018 and is poised to receive $764,398 in additional Symantec stock at the end of fiscal year 2019.

| Executive | PRU Target # | Target PRU Value at Grant Date | Eligible & Earned PRUs at End of Fiscal 2018 | Actual Value of PRUs at End of Fiscal 2018 | Remaining PRUs to be Received at End of Fiscal 2019 | Value of Remaining PRUs To Be Received At End Of Fiscal 2019 |
|---|---|---|---|---|---|---|
| Clark | 961,670 | $16,636,891 | 2,404,175 | $41,592,228 | 175,024 | $3,027,914 |
| Noviello | 242,774 | $4,199,990 | 606,935 | $10,499,975 | 44,185 | $764,383 |

188.   Moreover, for fiscal 2018, the Compensation Committee determined that PRUs would be awarded based on the Company's 2018 non-GAAP EPS, with a target of $1.64 per share.  The Compensation Committee determined that the Company achieved non-GAAP EPS of $1.56 per share, or 95.2% of target, resulting in 25.25% of the total fiscal 2018 PRUs becoming eligible to be earned at the end of the fiscal year 2018 PRU Performance Period at the end of fiscal 2020.

189.   Thus, as set forth in the table below, due to Defendants' manipulation of the Company's non-GAAP EPS, Defendant Clark is eligible to receive 85,768 Symantec shares with a value at grant date (June 9, 2017) of nearly $3 million at the end of fiscal year 2020.  Similarly, Defendant Noviello is eligible to receive over 40,000 Symantec shares with a value at grant date of over $1.3 million at the end of fiscal year 2020.

| FY 2018 PRU PLAN | | | | |
|---|---|---|---|---|
| Executive | PRU Target # in Year One | Target PRU Year One Value at Grant Date | PRUs Eligible To Be Earned at end of fiscal 2020 | Actual Value of PRUs Eligible To Be Earned At End Of Fiscal 2020 |
| Clark | 169,837 | $5,828,806 | 85,768 | $2,943,547 |
| Noviello | 79,257 | $2,720,100 | 40,025 | $1,373,651 |

## X.   DAMAGES TO SYMANTEC

190.   As a direct and proximate result of the Defendants' actions, Symantec has been seriously harmed and will continue to be. Such harm includes, but is but not limited to:

(a)   Legal fees incurred in connection with the Securities Class Action;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

<u>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u>

1       (b)    Any funds paid to settle the Securities Class Action;

2       (c)    Costs incurred in connection with any governmental investigation

3 into the Company's accounting practices;

4       (d)    Costs incurred by issuing 8 million shares to the Equity Incentive

5 Compensation Plan due to the shareholder vote obtained by representations in the

6 misleading proxy statement**;**

7       (e)    Excessive compensation paid to Officer Defendants due to artificially

8 inflated non-GAAP measures; and

9       (f)    Excessive compensation and benefits paid to the defendants who

10 have breached their duties to Symantec.

11    191.    In addition, Symantec's business, goodwill, and reputation with its business

12 partners, regulators, and shareholders have been gravely impaired.  The Company still has not

13 fully admitted the nature of its misleading statements and the true condition of its business.  The

14 credibility and motives of management are now in serious doubt.

15    192.    The actions complained of herein have irreparably damaged Symantec's corporate

16 image and goodwill.  For at least the foreseeable future, Symantec will suffer from what is

17 known as the "liar's discount," a term applied to the stocks of companies who have been

18 implicated in illegal behavior and have misled the investing public, such that Symantec's ability

19 to raise equity capital or debt on favorable terms in the future is now impaired

20 **XI.**    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

21    193.    Plaintiff brings this action derivatively in the right and for the benefit of Symantec

22 to redress injuries suffered, and to be suffered, by Symantec as a direct result of breaches of

23 fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and

24 abetting thereof, by the Defendants.  Symantec is named as a nominal defendant solely in a

25 derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it

26 would not otherwise have.

27

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

194.    Plaintiff will adequately and fairly represent the interests of Symantec in enforcing and prosecuting its rights.

195.    Plaintiff was a stockholder of Symantec at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Symantec stockholder.

196.    When this action was filed, Symantec's Board of Directors consisted of thirteen directors: defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, Vautrinot and non-party directors Sue Barsamian, Peter A. Feld, Dale L. Fuller, and Richard S. Hill. Plaintiff did not make any demand on the Board to institute this action because there is reason to doubt that nine of the thirteen current members of the Board could disinterestedly respond to a demand. ██████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████

**Defendant Clark**

197.    At all relevant times, Clark was the Company's CEO and President. Clark personally pressured employees to engage in aggressive accounting practices to overstate revenue and operating income metrics that would increase his compensation. ████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

198.    Defendant Clark received many millions of dollars in excessive incentive compensation due to manipulation of non-GAAP financial measures that participated in and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

concealed.  As a result, Clark would be interested in a demand regarding his receipt of improper incentive compensation and demand is excused on that basis.

199.    Defendant Clark is not disinterested because he is primarily employed as the CEO and President of Symantec.  He is an employee of the Company, earning more than $23 million in compensation over two fiscal years, according to the 2018 proxy statement.  Moreover, Clark is not an independent director under the listing standards of the NASDAQ exchange or as defined by the Company.  As a result, demand is excused as to Clark on this basis as well.

**Defendant Dangeard**

200.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

201.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



202.

203.

204.

205.

As a result, demand is excused as to defendant Dangeard regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Defendant Hao**

206.

207.

208.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

209. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

210. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

211. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████ As a result, demand is excused as to defendant Hao regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Humphrey**

212. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

217. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████. As a result, demand is excused as to defendant Humphrey regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Mahoney**

218. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

219. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



220.

221.

222.

223.

As a result, demand is excused as to defendant

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

<u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>

1  Mahoney regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he
2  consciously permitted.

3  **Defendant Sands**

4  224. ████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████████████████████████████
8  ████████████████████████████████████████████
9  ████████████████████████████████████████████
10  ████████████████████████████████████████████
11  ████████████████████████████████████████████
12  ████████████████████████████████████████████
13  ████████████████████    ██████████████████
14  ████████████████████████████████████████████
15  ████████████████████████████████████████████
16  ████████████████████████████

17  225. ████████████████████████████████████████
18  ████████████████████████████████████████████
19  ████████████████████████████████████████████
20  ████████████████████████████████████████████
21  ████████████████████████████████████████████
22  ████████████████████████████████████████████
23  ████████████████████████████████████████████
24  ████████████████████████████████████████████
25  ████████████████████████

26  226. ████████████████████████████████████████
27  ████████████████████████████████████████████
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

227.

228.

229.

As a result, demand is excused as to defendant Sands regarding his wrongdoing and the wrongdoing of the Officer Defendants, which she consciously permitted.

**Defendant Schulman**

230.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



231.

232.

233.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

234. ████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████

235. ████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████ As a result, demand is excused as to defendant Schulman regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Unruh**

236. ████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████  ███████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

237.

238.

239.

240.

241.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

<u>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u>

1 ████████████████████████████████████████████████

2 ███████████████████████████████ As a result, demand is excused as to defendant Unruh

3 regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously

4 permitted.

5 **Defendant Vautrinot**

6 242. ████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████████████████████████

19 243. ████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████  ██████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ██████████████████████  ██████████████████████████

27 ███████████████████████████████████████████

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**



244. █████████████████████████████████

245. █████████████████████████████████

246. █████████████████████████████████

247. █████████████████████████████████

As a result, demand is excused as to defendant Vautrinot regarding her wrongdoing and the wrongdoing of the Officer Defendants, which she consciously permitted.

**Defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot**

248.    Demand is excused as to the decision of defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot to issue the materially misleading 2017 proxy statement.  On August 16, 2017, these nine defendants solicited shareholder votes to,

63

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

among other things, approve amendments to Symantec's 2013 Equity Incentive Plan at the Company's 2017 annual meeting on October 5, 2017.  When they approved issuance of the proxy statement, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

249.    Additional evidence that Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot knew executive incentive compensation was being manipulated to increase payouts include: (i) that the Board's process for setting incentive compensation targets departed sharply from past practice; (ii) the Board belatedly changed the financial metrics used as targets in ways that appear to have benefited management; and (iii) with only three months remaining in the fiscal year the Board decided to change the *year* during which the results were to be achieved such that 2017 incentive compensation would be evaluated against 2018 results.  Never before had the Board set the targets so late in the year, used the metrics as targets, or measured achievement of incentive compensation.

250.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

251.    The decision to issue the proxy statement knowing that it disclosed executive compensation practices and amounts based on improperly inflated results could not have been a valid exercise of business judgment, and was, at a minimum, negligent, subjecting defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot to a

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  substantial likelihood of liability for violation of Section 14 of the Securities Exchange Act of

2  1934.  As a result, demand is excused in connection with the issuance of the misleading 2017

3  proxy statement.

4  **XII.   CLAIMS**

## COUNT I
### Against the Defendants for Breach of Fiduciary Duty

5

6       252.    Plaintiff incorporates by reference and realleges each and every allegation

7  contained above, as though fully set forth herein.

8       253.    Each Defendant owes and owed to the Company the duty to exercise candor, good

9  faith, and loyalty in the management and administration of Symantec's business and affairs,

10  particularly with respect to issues as fundamental as public disclosures.

11      254.    The Defendants' conduct set forth herein was due to their intentional or reckless

12  breach of the fiduciary duties they owed to the Company.  The Defendants intentionally or

13  recklessly breached or disregarded their fiduciary duties to protect the rights and interests of

14  Symantec.

15      255.    In breach of their fiduciary duties owed to Symantec, the Defendants willfully

16  participated in and caused the Company to expend unnecessarily its corporate funds, rendering

17  them personally liable to the Company for breaching their fiduciary duties.

18      256.    In particular, the Defendants knowingly or recklessly made untrue statements

19  and/or permitted the Company's public filings, disclosures, and statements to misleadingly

20  represent the Company's financial metrics, including non-GAAP revenue and non-GAAP

21  operating income.

22      257.    As a direct and proximate result of the Defendants' breaches of their fiduciary

23  obligations, Symantec has sustained and continues to sustain significant damages.  Including

24  direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in

25  the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the

26  Company.

27

28

## COUNT II
### Against Clark, Noviello, Garfield, Sands, and Vautrinot – *Brophy* Claim

258.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

259.    As alleged above, Clark, Noviello, Garfield, Sands, and Vautrinot are fiduciaries of Symantec, possessed material, non-public information of Symantec, and used that information improperly to profit from sales of Symantec stock.  When Clark, Noviello, Garfield, Sands, and Vautrinot directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

260.    When Clark, Noviello, Garfield, Sands, and Vautrinot sold their Symantec stock, they knew that the investing public was unaware of the negative material information that they possessed.  They also knew that if the information were disclosed, the market price of Symantec stock would be significantly lower.  Clark, Noviello, Garfield, Sands, and Vautrinot timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating Symantec's non-public information.

261.    Plaintiff has no adequate remedy at law.

## COUNT III
### Against Clark, Noviello, and Garfield for Unjust Enrichment

262.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

263.    By their wrongful acts and omissions, Clark, Noviello, and Garfield were unjustly enriched at the expense of and to the detriment of Symantec.  Clark, Noviello, and Garfield were unjustly enriched as a result of the compensation they received while breaching fiduciary duties owed to Symantec.

264.    Plaintiff, as a stockholder and representative of Symantec, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

265.    Plaintiff, on behalf of Symantec, has no adequate remedy at law.

**COUNT IV**
**Violations of Section 14 of the Securities Exchange Act of 1934**
**Against Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller,**
**Sands, Schulman, Unruh, and Vautrinot**

266.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

267.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on August 16, 2017 violated §14(a) and Rule 14a-9 because it: a) it did not disclose that executives exercised discretion over the characterization of certain costs which impacted the non-GAAP metrics used to award incentive compensation; b) that executives had manipulated the non-GAAP metrics by improperly recognizing revenue for contracts were not reasonably likely earned or collectible; c) the non-GAAP adjustments applied to revenue and operating income were improper; and d) as a result, executive incentive compensation amounts were inflated due to the manipulation of the non-GAAP adjustments.

268.    In the exercise of reasonable care, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot should have known that the statements contained in the proxy statement were materially false and misleading.

269.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2017 proxy statement solicited shareholder votes for five management proposals including approval of amendments to the Company's 2013 Equity Incentive Plan.  On the basis of representations in the proxy statement, Symantec's public shareholders approved management's proposal to amend the 2013 Equity

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Incentive Plan. As a result, the proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

270.   Due to the votes solicited by the proxy statement, Symantec issued millions of shares to the 2013 Equity Incentive Plan. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement

## XIII.   PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Symantec, demands judgment as follows:

A.   Declaring that plaintiff may maintain this action on behalf of Symantec and that plaintiff is an adequate representative of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Symantec;

D.   Directing Symantec to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Symantec and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.   a proposal to strengthen the Company's controls over financial reporting;

2.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

3. a proposal to strengthen Symantec's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of Symantec to nominate at least three candidates for election to the Board;

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Symantec has an effective remedy;

F. Awarding to Symantec restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

**XIV. JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.

Dated: May 10, 2019   GLANCY PRONGAY & MURRAY LLP

        */s/ Lesley F. Portnoy*
        ROBERT V. PRONGAY
        LESLEY F. PORTNOY
        PAVITHRA RAJESH
        1925 Century Park East
        Los Angeles, CA 90067
        Telephone: (310) 201-9150

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
GLANCY PRONGAY & MURRAY LLP
712 Fifth Avenue
New York, NY 10019
(212) 935-7400

*Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**EXHIBIT A**

**EXHIBIT A**



| Date: | Committee or Full Board: | Clark: | Dangeard: | Hao: | Humphrey: | Mahoney: | Sands: | Schulman: | Unruh: | Vautrinot: |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| | Total Meetings: | | | | | | | | | |

The above information was provided by Symantec in response to plaintiff's books and records demand.