1  Robert V. Prongay (SBN 270796)
      *rprongay@glancylaw.com*
2  Pavithra Rajesh (SBN 323055)
      *prajesh@glancylaw.com*
3  **GLANCY PRONGAY & MURRAY LLP**
   1925 Century Park East, Suite 2100
4  Los Angeles, California 90067
   Telephone: (310) 201-9150
5  Facsimile: (310) 201-9160

6  Matthew M. Houston
      *mhouston@glancylaw.com*
7  Benjamin I. Sachs-Michaels
      *bsachsmichaels@glancylaw.com*
8  **GLANCY PRONGAY & MURRAY LLP**
   745 Fifth Avenue, 5th Floor
9  New York, NY 10151
   Telephone: (212) 935-7400

10 *Counsel for Plaintiff*

11                      **UNITED STATES DISTRICT COURT**

12                     **NORTHERN DISTRICT OF CALIFORNIA**

13

14 | GUYE LEE, derivatively on behalf of | Case No. 3:19-cv-02522-WHA |
   | SYMANTEC CORPORATION, | |

15 |                       Plaintiff, | **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |

16 |         v. | |

17 | GREGORY S. CLARK, FRANK E. | <u>REDACTED VERSION</u> |
18 | DANGEARD, KENNETH Y. HAO, DAVID W. HUMPHREY, DAVID L. MAHONEY, | |
   | ANITA M. SANDS, DANIEL H. | |
19 | SCHULMAN, V. PAUL UNRUH, | |
   | SUZANNE M. VAUTRINOT, NICHOLAS R. | |
20 | NOVIELLO, MARK S. GARFIELD, | |
   | ROBERT S. MILLER, and GERALDINE B. | |
21 | LAYBOURNE | |

22 |                       Defendants, | |

23 |         and | |

24 | SYMANTEC CORPORATION, a Delaware | |
   | Corporation, | |
25 | | |

26 |                       Nominal Defendant. | |

27

28

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

Plaintiff Guye Lee, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Symantec Corporation n/k/a NortonLifeLock Inc. ("Symantec" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its current and former officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*i.e. Brophy* claim), unjust enrichment, and violations of § 14 of the Securities Exchange Act of 1934. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included the review and analysis of: (a) documents and information obtained pursuant to 8 Del. C. § 220 ("the 220 Demand"); (b) public filings in the related securities class action captioned *Felix v. Symantec Corp.*, *et al.*, 3:18-cv-02902-WHA (the "Securities Class Action"); (c) public filings made by Symantec and other related parties and non-parties with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (d) press releases and other publications disseminated by certain of the Defendants (defined herein) and other related non-parties; and (e) other publicly available information concerning Symantec and Defendants.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      At all relevant times, Symantec provided cybersecurity products and services, including its flagship Norton Antivirus software. In 2016, Symantec acquired Blue Coat Systems, Inc. ("Blue Coat"), a privately-held network security firm. Following the acquisition, Blue Coat's Chief Executive Officer ("CEO"), Gregory S. Clark ("Clark"), became CEO of Symantec and installed former Blue Coat executives in key executive roles at Symantec, including Chief Operating Officer, Chief Financial Officer, Chief Strategy Officer, Chief Technology Officer, and Head of Worldwide Sales.

2.      After acquiring Blue Coat, Symantec announced the acquisition of LifeLock, Inc. ("LifeLock"), a consumer identity-protection company. Symantec's new leadership claimed that the acquisitions would be "transformative" for the Company by reinvigorating its stagnant Enterprise and Consumer business segments and by providing benefits from synergies and other

cost savings initiatives.  According to Symantec executives, the Company would emerge as the most dominant provider of cybersecurity solutions.

3.     To meet these lofty promises, Defendants manipulated Symantec's core financial metrics.  Defendants improperly recorded ongoing costs as "transition costs" and removed them from their adjusted operating expenses, thus inflating non-GAAP revenue, operating income, and earnings per share, all of which were used to determine executive bonus compensation.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP revenue recognition criteria.  Moreover, Defendants also improperly recognized revenue on sales that: (i) did not have signed contracts; (ii) did not go through the appropriate approval channels; (iii) contained unapproved extended terms; or (iv) were to customers who were unable or unwilling to pay.

4.     In 2017, while they were disclosing artificially inflated non-GAAP revenue and operating income and otherwise misrepresenting the Company's performance, the Board issued a proxy statement soliciting, and ultimately obtaining, shareholder approval to increase the Company's 2013 Equity Incentive Plan by 8 million shares.  However, the proxy statement soliciting the votes misleadingly represented that Symantec's Executive Annual Incentive Plan ("AIP") 2017 non-GAAP revenue and operating targets had been exceeded, resulting in the payment of millions of dollars to Symantec executives.

5.     Plaintiff's investigation demonstrates that unbeknownst to the shareholders who voted to amend the 2013 Equity Incentive Plan, both the non-GAAP revenue and operating income results that were the basis of these payouts were artificially inflated by improper adjustments.  Had the appropriate adjustments been applied, funding under the non-GAAP revenue metric of the AIP would have been zero, as opposed to 100%, and funding under the non-GAAP operating income metric would have been zero, as opposed to 125%.

6.     Defendants issued public statements touting the Company's non-GAAP revenue and operating income performance as the fruits of successful acquisition integration until May 10, 2018, when they disclosed that the Audit Committee had commenced an internal investigation into the Company's accounting practices due to concerns raised by a former employee.   Given the

investigation, the Company disclosed that it had frozen executive incentive compensation, that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner." On this news, the Company's stock price fell $9.66 per share, or more than 33%, to close at $19.52 per share on May 11, 2018.

7.     On September 24, 2018, the Company revealed the conclusions of the Audit Committee investigation. Among other things, there were weak and informal processes governing the review and approval of transition expenses; the Company had improperly recognized $12 million as revenue in the Q4 2018 which should have been deferred; and the Company would have to revise previously issued financial statements for Q4 2018 and Q1 2019.

8.     Suspecting wrongdoing, on May 23, 2018, Plaintiff served a books and records demand on the Company pursuant to 8 Del. C. § 220. After negotiations, the Company produced documents and information subject to a confidentiality agreement in response to the demand. The books and records production forms the basis for many of the factual allegations herein.

9.     Due to information obtained in response to the books and records demand, plaintiff did not make a litigation demand on the Board prior to filing this action. At the time this action was filed, the Board was composed of thirteen members. Of those thirteen members, nine are named as defendants in this action, and the remaining directors were appointed to the Board after the wrongdoing. All of the defendants named in this action who were directors of the Company when this action was commenced took actions that were not valid exercises of business judgment, face a substantial likelihood of liability for their wrongdoing, and would be interested in a demand to investigate their own wrongdoing. The CEO participated in the alleged misconduct and would be interested in a demand to investigate his own wrongdoing. All nine current Director Defendants (defined herein) attended ten or more meetings during which problems with Symantec's internal controls and the non-GAAP adjustments were reviewed and discussed at length. Attached hereto as Exhibit A is a table depicting the attendance of the nine Director Defendants at Audit Committee and full Board meetings between August 1, 2016 and December 20, 2017 during which Symantec's non-GAAP financial metrics were discussed. Additionally, each of the nine directors solicited

shareholder votes in approval of the amendment to the 2013 Equity Incentive Plan on the basis of a proxy statement that misrepresented Symantec's results and concealed the wrongful payment of millions of dollars in incentive compensation.  Thus, at least half of Symantec's current Board is not disinterested and independent and/or faces a substantial likelihood of liability in connection with the wrongdoing detailed herein.

**II.      JURISDICTION AND VENUE**

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**III.      THE PARTIES**

**Plaintiff**

12.      Plaintiff Guye Lee purchased Symantec stock in 2001 and has continuously owned Symantec stock since that time.

**Nominal Defendant**

13.      Nominal Defendant Symantec is a corporation incorporated under the laws of Delaware.  At all relevant times, Symantec provided cybersecurity products and services, including its flagship Norton Antivirus software, and its principal executive offices were located at 350 Ellis Street, Mountain View, California 94043.  In November 2019, the Company sold its enterprise security business to Broadcom Inc. and changed its name to NortonLifeLock Inc. As a result, the Company's stock symbol changed from "SYMC" to "NLOK" on the NASDAQ exchange.

**Defendants**

14.     Defendant Gregory S. Clark ("Clark") was a director, CEO, and President of the Company from August 2016 to April 2019.  Prior to joining the Company, Defendant Clark was the CEO and a director of Blue Coat from 2011 to August of 2016.

15.     Defendant Frank E. Dangeard ("Dangeard") has served as a director of the Company since 2007.  Dangeard is, and was at relevant times, a member of the Audit Committee.

16.     Defendant Kenneth Y. Hao ("Hao") has served as a director of the Company since 2016.

17.     Defendant David W. Humphrey ("Humphrey") served as a director of the Company from 2016 to January 2021.  Humphrey was a member of the Audit Committee until late 2018.

18.     Defendant David L. Mahoney ("Mahoney") served as a director of the Company from 2013 to December 2019.

19.     Defendant Anita M. Sands ("Sands") served as a director of the Company from 2013 to December 2019.  Sands was a member of the Audit Committee.

20.     Defendant Daniel H. Schulman ("Schulman") served as a director of the Company from 2000 and as Chairman of the Board since 2013 until his retirement in December 2019.

21.     Defendant V. Paul Unruh ("Unruh") served as a director of the Company from 2005 to September 2020.  Unruh was the Chair of the Audit Committee.

22.     Defendant Suzanne M. Vautrinot ("Vautrinot") served as a director of the Company from 2013 to December 2019.  Vautrinot was a member of the Audit Committee.

23.     Defendant Nicholas R. Noviello ("Noviello") was the Chief Financial Officer ("CFO") of the Company from December 1, 2016 to May 2019.  Prior to joining the Company, Noviello served as Blue Coat's CFO.

24.     Defendant Mark S. Garfield ("Garfield") was the Chief Accounting Officer of the Company from February 3, 2014 to August 7, 2017.

25.     Defendant Robert S. Miller ("Miller") was a director of the Board from 2003 until 2018. Miller was a member of the Audit Committee.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

1      26.      Defendant Geraldine B. Laybourne ("Laybourne") was a director of the Board from
2  2008 to 2018.

3      27.      Defendants Clark, Noviello, and Garfield are sometimes referred to herein as the
4  "Officer Defendants." Defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman,
5  Unruh, Vautrinot, Miller, and Laybourne are sometimes referred to herein as the "Director
6  Defendants."

7  **Non-Party Directors**

8      28.      Susan P. Barsamian has served as a director of Symantec since January 7, 2019.

9      29.      Richard S. Hill served as a director of Symantec from January 7, 2019 through
10  commencement of this action.

11      30.      Peter A. Feld has served as a director of Symantec since 2018.

12      31.      Dale L. Fuller served as a director of Symantec from 2018 through commencement
13  of this action.

14  **IV.    DUTIES OF THE OFFICER AND DIRECTOR DEFENDANTS**

15      **A.    Fiduciary Duties**

16      32.      By reason of their positions as officers, directors, and/or fiduciaries of Symantec and
17  because of their ability to control the business and corporate affairs of Symantec, at all relevant
18  times defendants owed Symantec and its shareholders fiduciary obligations of good faith, loyalty,
19  and candor, and were required to use their utmost ability to control and manage Symantec in a fair,
20  just, honest, and equitable manner.  Defendants were required to act in furtherance of the best
21  interests of Symantec and its shareholders so as to benefit all shareholders equally and not in
22  furtherance of their personal interest or benefit.  Each director and officer of the Company owes to
23  Symantec and its shareholders a fiduciary duty to exercise good faith and diligence in the
24  administration of the affairs of the Company and in the use and preservation of its property and
25  assets, and the highest obligations of fair dealing.

26      33.      Defendants, because of their positions of control and authority as directors and/or
27  officers of Symantec, were able to and did, directly and/or indirectly, exercise control over the
28  wrongful acts complained of herein.  Because of their advisory, executive, managerial, and

directorial positions with Symantec, each of the defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the officers and directors of Symantec were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Symantec were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority.

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Symantec's Codes Of Conduct And Of Ethics**

35.     Symantec's Code of Conduct ("Code of Conduct") "defines what [the Company] expect[s] from all employees."

36.     The Code of Conduct provides, as to "Finance and Accounting Practices," that employees must "accurately and completely record any financial information related to Symantec's revenues and expenses."  It further provides:

The Audit Committee is directly responsible for the appointment, compensation, and oversight of the work of the Company's independent auditors and work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents.  Violations of laws associated with accounting and financial reporting can damage Symantec's REPUTATION [sic], and can also result in fines, penalties, and even imprisonment. You should promptly report to the Chief Financial Officer, General Counsel or the Audit Committee of the Board of Directors any conduct that you believe to be a violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

37.    The Company also adopted its Financial Code of Ethics ("Code of Ethics") which provides certain practices "to ensur[e] compliance with the highest standards of financial accounting and reporting."  The Code of Ethics requires the CEO, CFO, and other members of the Company's Finance Department to, among other things: (i) "Communicate information in a manner that ensures full, fair, accurate, timely and understandable disclosure in reports and documents that Symantec files with, or submits to, government agencies and in other public communications"; and (ii) "Comply with applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies."

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

38.    On June 12, 2016, Symantec announced that it would acquire Blue Coat, a leader in the web and cloud security industry, for $4.65 billion.  The acquisition closed on August 1, 2016.

39.    Following the acquisition, Blue Coat executives—CEO, defendant Clark; CFO, defendant Noviello; Chief Technology Officer, Hugh Thompson; Chief Operating Officer ("COO"), Michael Fey; Chief Marketing Officer, Michael Williams; and Chief of Staff, Matt MacKenzie—all assumed identical posts at Symantec.

40.    On November 20, 2016, Symantec announced that it would acquire LifeLock, an identity-protection software company, for $2.3 billion.  The acquisition closed on February 3, 2017.

41.    In addition to $550 million in cost synergies from the Blue Coat acquisition, Defendants claimed that the LifeLock acquisition would result in $30 million cost synergies by the end of Symantec's fiscal year 2018 and would increase to over $80 million by the end of fiscal year 2020.

### B.    Defendants Manipulated the Company's Financial Metrics

42.    To meet the lofty promises of the "transformational" acquisitions and to meet executive compensation targets, Defendants manipulated the Company's revenue and operating income metrics.  First, Defendants overstated revenue by improperly recognizing revenue, including revenue that should have been deferred, in violation of GAAP.  Second, Defendants improperly

1  recorded operating expenses incurred in the ordinary course of business as "transition costs" and
2  adjusted those costs to overstate non-GAAP operating income.

3            **1.      Defendants Caused the Company to Improperly Recognize Revenue**

4                 **a)      Applicable Accounting Principles**

5        43.      GAAP is the set of standardized rules used to prepare financial statements.  The SEC
6  has the statutory authority to codify GAAP and has delegated that authority to the Financial
7  Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. Part 210) provides that financial
8  statements filed with the SEC that are not presented in accordance with GAAP will be presumed to
9  be misleading, despite footnotes or other disclosures.

10       44.      Under GAAP, revenue is recognized when certain criteria are met and in the period
11 when those criteria are met.  Accrual accounting, a method that records revenues when earned and
12 expenses when incurred, aims "to account in the periods in which they occur for the effects on an
13 entity of transactions and other events and circumstances" using the "matching principle," which
14 matches revenue to the period to which it relates.  Financial Accounting Standards Board Concepts
15 Statement ("FASCON") No. 6. Symantec uses the accrual accounting method.

16       45.      Accounting Standards Codification ("ASC") 605-10-25-1 provides that revenue may
17 be recognized when it is realized or realizable and earned.  ASC Topic 605 provides, in relevant
18 part: "Revenue and gains are realized when products (goods or services), merchandise or other assets
19 are exchanged for cash or claims to cash. . . . [R]evenue and gains are realizable when related assets
20 received or held are readily convertible to known amounts of cash or claims to cash."  Additionally,
21 ASC Topic 605 states:

22          Revenue is not recognized until earned. . . . [A]n entity's revenue-earning activities
           involve delivering or producing goods, rendering services, or other activities that
23         constitute its ongoing major or central operations, and revenues are considered to
           have been earned when the entity has substantially accomplished what it must do to
24         be entitled to the benefits represented by revenues.

25       46.      ASC 985-605-25-3, *Software Not Requiring Significant Production, Modification,*
26 *or Customization*, establishes basic revenue recognition criteria for software licenses.  ASC 985-
27 26605-25-3 provides:

28

If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:

      a.     Persuasive evidence of an arrangement exists;

      b.     Delivery has occurred;

      c.     The vendor's fee is fixed or determinable; and

      d.     Collectability is probable.

47.     With respect to subpart (a), ASC 605-25-16 further states:

If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization). If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.

48.     ASC 958-605-25-21 further reiterates with regard to customer acceptance, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."

49.     With regard to Subpart 3(d), whether collectability is probable, ASC 985-605-25-34 provides that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

50.     Symantec's revenue recognition policy purports to comply with these accounting standards, stating in relevant part: "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

51.     The Company's independent accounting firm, KPMG LLP ("KPMG"), issued guidance regarding Revenue from Contracts with Customers: "Under current SEC guidance, if an entity's customary business practice is to have, in addition to meeting the other criteria, a contract signed by both parties before it concludes that persuasive evidence of an arrangement exists, the entity does not recognize revenue until a written sales agreement is finalized–including being signed by both the customer and the entity . . . ." The same KPMG guidance states, "Under current SEC

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

guidance and U.S. GAAP for software entities, consideration in a contract has to be fixed or determinable in order for the entity to recognize revenue."

52.    Accordingly, under GAAP and Symantec's revenue recognition policy, and consistent with the guidance provided by Symantec's auditor, revenues must not be recognized (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.

53.    Deferred revenue, or payments that a company receives for products or services that are to be delivered or performed in the future, is a liability.  Deferred revenue is recorded when a company bills a customer before satisfying GAAP's revenue recognition criteria. Recognizing deferred revenue that is not realized, or not realizable and earned, violates GAAP.

> **b)    Defendants Improperly Recognized Revenue to Achieve the Target Numbers for a Given Period**

54.    Defendants violated GAAP by recognizing revenue at period-end on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

55.    Defendant Clark regularly discussed that the hardware business enabled the flexibility to shift and/or to spread out revenue over time and that Blue Coat had the ability to "massage" revenue over time.  Defendant Clark frequently discussed "opportunities" to manipulate or to adjust revenue by various periods or by a year.  For example, if the Company had already achieved its target for a particular quarter, then management would not deliver and record revenue until the next quarter.

56.     The Officer Defendants caused the Company to accelerate revenue recognition by shifting the Company from a subscription model to a licensing model, which would enable them to recognize revenue upfront rather than deferring it over several periods.

57.     The Officer Defendants caused the Company to recognize revenue on contracts that did not meet the Company's own accounting policies.  To increase revenue for a given reporting period, the Officer Defendants caused the Company to recognize revenue on contracts at the end of the quarter for which they knew the orders would not be processed or on contracts that were not signed.  The next quarter, the Officer Defendants would cause the Company to back out the orders.

58.     The Officer Defendants would accelerate multi-million dollar deals by two or three quarters to meet the target numbers for the quarter, even though the customers had not undergone a thorough credit check.  For example, in January 2016, a deal worth approximately $6 million was recognized two to three quarters ahead of time to meet the numbers for the fiscal year ending April 1, 2016.

59.     The Officer Defendants caused the Company to offer incentives, such as free security certifications, or favorable payment options, such as extended terms, to customers who were reluctant to sign.  The Finance Department either did not pre-approve, or was pressured by the Officer Defendants to approve, the financing options offered to such customers.

60.     The Officer Defendants discounted deferred revenue from the Watchful Software Acquisition, which included several years of maintenance revenue, and recognized it upfront to boost numbers for the current period even though the revenue would be earned over time.  The Officer Defendants stopped recording deferred revenue and instead recognized the contracts as revenue.

61.     Defendant Garfield ultimately left the Company because he was unwilling to continue the improper revenue recognition practices, but only after he signed off on the books for the 2017 financial year in exchange for a financial package.

62.     The Officer Defendants caused the Company to push deals to subsequent quarters on at least five occasions.  For example, a senior executive at Symantec who had worked for Blue Coat improperly circumvented the Company's approval process and offered a $1 million discount to one

of his contacts at Verizon as an incentive to close a $13 million deal at the end of Q4 2017. The deal was booked for Q1 2018, even though it had closed in Q4 2017, and was booked to include products that were not part of the deal. The unauthorized discount impacted the Company's run rate, which must stay above a certain level under applicable accounting rules. The motive for the decision to book the Verizon deal in Q1 2018 instead of Q4 2017 is that during Q4 2017, the Board changed the metric for the fiscal 2017 PRU grants from non-GAAP operating income margin for fiscal 2017 to non-GAAP operating income for fiscal 2018.

63. The pull-forward of revenue was in part to disguise Blue Coat's underperformance. According to defendant Garfield as part of his exit interview, Blue Coat "missed bookings (and revenue) in all five quarters since [Symantec] bought them." Securities Class Action, Dkt. 337, Ex. 105.[1] The revenue miss was so dramatic that the Company "considered revaluing [BlueCoat], and decreasing the value of that technology because they've missed revenue so bad." *Id.*

64. Upon information and belief, the Officer Defendants urged the Company's account managers to make verbal agreements with customers, even though such side agreements would violate the Symantec's compliance policies.

        **c)**     **Symantec Improperly Recognized Revenue in a Transaction with Oracle**

65. In another instance, Symantec failed to defer $12 million in revenue related to concurrent purchase and sale transactions with Oracle Corp. ("Oracle"), allowing the Company to report $6 million in GAAP operating income for the fourth quarter of 2018. Specifically, in February 2018, Symantec agreed to purchase Oracle's cloud solution for the Company's quote-to-order process in a $53 million transaction over a 5-year deployment period. SEB Investment Management AB v. Symantec Corp. et al., C.A. No. 3:18-cv-02902-WHA (N.D. Cal.) (the "Securities Class Action"), Dkt. 347, Ex. 95. The next month, Symantec sold Oracle its Security Analytics and SSL products for $21 million over a 4-year license period. *Id.* Symantec's VP of Finance, Matthew

---

[1]     References to "Securities Class Action, Dkt. _" refer to discovery documents produced in the Securities Class Action and filed on the public docket of the Securities Class Action as exhibits to summary judgment briefing.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

Brown was immediately "concerned with the potential for this being a roundtrip transaction," which he conveyed to defendant Noviello in March 2018. Securities Class Action, Dkt. 336, Ex. 96.

66.     Oracle was "push[ing] to include future functionality on [Symantec's] solution," and defendant Clark "wanted to know if there was something [Symantec] could include that wouldn't impact rev rec [i.e. revenue recognition]." *Id.* However, Mr. Brown was confident "that the guidance is pretty clear on this" and that including a future functionality would preclude the Company from reporting upfront revenue. *Id.* Mr. Brown conveyed to defendant Noviello, who then informed defendant Clark, "that we can't include anything with future functionality, whether in the contract or verbal." *Id.* Mr. Brown "suggested we could include the language [for future functionality] and just defer the revenue, but revenue looks to be coming in short." *Id.*

67.     Despite these warnings, on March 30, 2018, defendant Clark texted Oracle's President of Product Development, Thomas Kurian, that Symantec "can't send a loi or a zero dollar sow . . . we will get it done but we can't contract to it." Securities Class Action, Dkt. 347, Ex. 99.

68.     Evidencing their knowledge that such maneuvers were improper, management held these discussions live to avoid a written record. For example, in connection with the Audit Committee's investigation, the Board reviewed the following exchange between Symantec's CMO, Fey, and James Dildine, Symantec's VP of Finance (who served as VP of the Enterprise division), on February 2, 2018 regarding a deal with Oracle, which was uncovered during the Audit Committee's investigation:

> 10:01 am – MF: "We agreement on oracle which could be 30m + of SA maybe even 40m of sa (sic) and proxy"
>
> 10:28 am – MF: "Yeah I dont (sic) expect you to see oracle or have anything on it yet"
>
> 10:29 am – JD: "Sep but the view from steve (sic) t on sfdc (sic) is remote for quarter and would be little to no rev if happened"
>
> 10:29 am – MF: "Yeah will talk live"
>
> 10:30 am – MF: "***stay off email on it***"[2]

---

[2]     Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

69.     Following the Audit Committee investigation months later, Symantec determined that "the [C]ompany [had] set a reasonably likely expectation with Oracle that they will receive the functionality within a short period of time," but the "Revenue Accounting team was not aware of the expectation of future functionality with Oracle." Securities Class Action, Dkt. 347, Ex. 100. As a result, Symantec had improperly recognized $12 million revenue in fourth quarter 2018, which should have been deferred until the period in which the services were provided. *Id.* This correction, and the impact to related line items, caused Symantec to report non-GAAP revenue of $1.222 billion and non-GAAP operating income of $434 million for fourth quarter 2018. *Id.*

### 2.     Defendants Manipulated Reported Transition Costs

#### a)     Applicable Regulations

70.     "Non-GAAP" financial measures present an adjusted picture of the company's past or future financial performance. These adjusted financial measures typically remove the effect of certain revenues and expenses that may be non-recurring or not part of the company's core operations. Symantec reported non-GAAP financial measures in its earnings press releases and financial statements.

71.     Due to companies' increased reliance on adjusted metrics, the SEC has issued rules, regulations, and guidance that apply when a company publicly discloses or releases financial information that includes an adjusted measure. Among others, Regulation G (17 C.F.R.24 § 244.100), which applies to the disclosure of adjusted measures, prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact. 17 C.F.R. § 244.100(b) provides:

A registrant, or a person acting on its behalf, ***shall not make public a non-GAAP financial measure that***, taken together with the information accompanying that measure and any other accompanying discussion of that measure, ***contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading***.

72.     SEC Regulation S-K, Item 10 (17 C.F.R. § 229.10) further prohibits a company from filing with the SEC an adjusted measure that adds back expenses that are related to the Company's ordinary course of business (i.e., recurring). 17 C.F.R. § 229.10(e)(1)(ii)(B) provides:

A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is ***reasonably likely to recur within two years or there was a similar charge or gain within the prior two years***.

73.     The SEC also publishes Compliance & Disclosure Interpretations containing questions and answers relating to adjusted financial measures. Question and Answer 100.01 provides:

**Question**: Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?

**Answer**: Yes.  ***Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading***.  For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.

74.     It is thus a violation of SEC Regulation G and Regulation S-K for a company to report adjusted financial measures that are misleading, omit to state a material fact necessary to make them not misleading, and/or exclude expenses in an adjusted measure that are related to the company's ordinary course of business.

75.     In addition, the SEC's Division of Corporate Finance published the following excerpt addressing the disclosure of adjusted financial measures: "If management is presenting the non-GAAP calculation as an alternative or pro forma measure of performance, the staff discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual." For example, it would be misleading for a company to exclude rent because it is an ongoing expense. Symantec improperly excluded ongoing consulting charges and other continuing costs from its adjusted measures, rendering those stated metrics misleading and in violation of SEC Regulations G and S-K.

**b)     Defendants Inflated Symantec's Non-GAAP Financial Metrics**

76.     Symantec's non-GAAP revenue is its reported GAAP revenue, adjusted for deferred revenue that had been written down in connection with Symantec's acquisitions (referred to as the "deferred revenue fair value adjustment").  As set forth herein, Defendants inflated reported GAAP revenue, which in turn manipulated the Company's reported non-GAAP revenue.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                16

77.     Symantec's non-GAAP operating income is its operating income less its adjusted operating expenses.  The Company adjusted its expenses to remove "transition costs," which are costs not incurred "in the ordinary course of business."  Defendants caused the Company to issue public statements representing that Symantec reported non-GAAP financial measures, excluding charges such as transition costs, "to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

78.     The Board discussed that it was improper to exclude recurring expenses from non-GAAP metrics. On May 8, 2017, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, Laybourne, Hao, Mahoney, and Schulman met for an Audit Committee meeting, where they reviewed seven "primary areas of SEC comments (as noted by Sulliven [sic] and Cromwell)" regarding non-GAAP measures, including "***misleading adjustments, such as exclusion of normal, recurring cash expenses***."

79.     Because transition costs are understood as one-time events, this mischaracterization impacts the public's perception of the Company's operations.  Additionally, by classifying certain operational expenses as "transition costs," such as the costs associated with the implementation of internal cloud-based software, the Officer Defendants were able to strategically capitalize these costs over a period of time, rather than record them as expenses when they were incurred as required. Therefore, costs for recurring projects incrementally impacted the Company's operational budget over time, and in turn the Company's financial metrics, rather than impacting the current period entirely.

80.     Characterizing recurring expenses as transition costs violates SEC rules and regulations that prohibit adjustments to "eliminate or smooth items characterized as nonrecurring, infrequent or unusual."  Moreover, SEC Regulation S-K specifically prohibits a company from filing with the SEC a non-GAAP measure that adds back expenses that are related to the ordinary course of business.

81.     Nevertheless, Defendants improperly characterized recurring expenses incurred in the ordinary course of business, such as general and administrative expenses, as "transition costs." For example:

(a)      In early 2017, Symantec decided to have its foreign subsidiaries function as buy-sell distributors, rather than intercompany service providers, due to changes in global tax rules. Securities Class Action, Dkt. 330, Ex. 61. This involved "one-time project implementation costs" totaling $45 million, and though "transitional in nature," Symantec's technical accounting team concluded that it "doesn't fit our current definition of T&T [Transition & Transformation] because it's not 'automating business processes.'" *Id.* Despite this conclusion by the Company's own accounting team, Defendants treated these costs as GAAP-only "given the materiality." *See id.*

(b)      In mid-2017, Symantec had a $60 million project to upgrade its security systems and centralize security resources, which technical accounting had determined "will not qualify for T&T treatment." Securities Class Action, Dkt. 330, Ex. 63. The tax department escalated the issue and was again told that the project "should be classified as OPEX as it doesn't appear to meet [Symantec's] definition of T&T." Securities Class Action, Dkt. 330, Ex. 64. When Symantec's Executive Vice President and General Counsel, Scott Taylor, asked for "some help with Technical Accounting" from defendants Clark and Noviello as this treatment would result in "$11M of additional overage for the fiscal year,"  defendant Clark responded "Let's discuss live." Securities Class Action, Dkt. 330, Ex. 65. The costs associated with the project were thereafter classified as T&T.

82.      Contemporaneous emails confirm that the finance team classified expenses as transition costs (without a reasonable basis to do so) to meet budget targets:

(a)      In an email dated February 20, 2017, defendant Clark was told that "we always have more control over our cost base," so the Head of Symantec's website security business can "get there via T&T," *i.e.* can meet targets by excluding T&T costs.  Securities Class Action, Dkt. 337, Ex. 104.

(b)      In an email on February 28, 2017, Symantec's Senior Manager, Internal Strategy Darren Wan told defendant Noviello that they'd been informed "that potentially none of the T&T expenses incurred in FY17 will continue to receive T&T treatment in FY18." Securities Class Action, Dkt. 324, Ex. 17. Nevertheless, he continued that "our current model assumes that ***we not only keep prior T&T treatment, but also assumes Day 1 T&T treatment for the spend we are***

*contemplating eliminating* (the $5.1M target from above [allocated to 3S]).” *Id.* In fact, in an email the prior day from Symantec's Senior Director, Enterprise Security Product Finance Vivek Mani, defendant Noviello was given “an update based on [their] conversation that captures the below additions: 1. Included Severance, 3rd party training costs, and $20M Network Infrastructure in T&T.” *Id.*

(c)     A February 28, 2017 presentation entitled “Website Security, PKI and Cyber-insurance Planning” explicitly stated that “Moving some of the Opex to one-off T&T can protect the 3 year bookings outlook.” Securities Class Action, Dkt. 324, Ex. 15. Though cast as a “Non Recurring Expenses Plan,” Symantec executives discussed that transition and transformation costs, such as “investing in WS / PKI restructuring effort[,] will improve the 3 year spend as well as bookings outlook.” *Id.*

(d)     In a March 4, 2017 email, Symantec's SVP, Finance Sean Delehanty told defendant Noviello that “we have offset the downsides with additional corporate task *so that net income is the same as the plan* that we pushed out to the groups a couple weeks ago.” Securities Class Action, Dkt. 324, Ex. 14. That is, any shortfall was manipulated using “additional corporate task[s],” such as website security, PKI, and cyber-insurance planning, to ensure that Symantec met its issued guidance.

83.     Moreover, Defendants inflated transition costs even after they were reported.  For Q1 2018, Defendants caused the Company to file a Form 10-Q with the SEC on August 4, 2017 that identified $28 million in transition costs.  For Q2 2018, Defendants caused the Company to file a Form 10-Q with the SEC on November 3, 2017 that reported $76 million in transition costs and that the Company had actually incurred $44 million in transition costs in Q1 2018—a difference of $16 million from the previously-reported number—resulting in $120 million transition costs over the prior two quarters. On October 28, 2018, Defendants caused the Company to file its Form 10-K with the SEC that reported $272 million in transition costs for fiscal year 2018, a 200% increase over the prior year for which the Company reported $94 million transition costs.

84.     The Officer Defendants caused the Company to frequently and aggressively classify projects for the ordinary course of business, such as enterprise resource planning, significant cloud

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                                           19

infrastructure, and security, as "transformational" to maintain operational budget.  The Officer Defendants exerted significant pressure on lower-level employees to coerce them to reclassify costs. For example, Symantec's Head of Technical Accounting, Abby Morrill, testified in the Securities Class Action that management pushed the finance team to classify certain expenses as GAAP-only to meet non-GAAP operating income targets. Securities Class Action, Dkt. 324, Ex. 19.  Up to tens of millions of dollars for such projects, including the associated labor costs, were reclassified as transformational costs, thus allowing the Officer Defendants to claim they were non-recurring transition costs excluded from non-GAAP operating income.  This practice allowed the Company to complete projects that otherwise did not fit the operational budget and to spread the costs over time.

85.     On several occasions, senior management overrode Symantec's finance personnel's determinations as to whether expenses were GAAP-only. For example, in an email on August 21, 2017, Abby Morrill explained why she does not "believe the costs of the M&A work, prior to entering an actual deal should be considered GAAP-only," relying on SEC Regulation G. Securities Class Action, Dkt. 325, Ex. 23. In another email, Ms. Morrill recognized that "all projects that are recorded as GAAP-only must be Board approved" "to ensure that the costs being 'GAAPed out' are truly for non-recurring activity." Securities Class Action, Dkt. 330, Ex. 66. She pointed out that Project Ace, which included diligence costs associated with the potential divestiture of one of Symantec's business units, could not be considered non-recurring activity because "[w]e have told the public that we are looking to do acquisitions each quarter." *Id.* However, Mr. Brown directed the team that "the advisory fees associated with the Ace project should continue to be recorded as GAAP-only in Q2'18." Securities Class Action, Dkt. 325, Ex. 23. He found that "[b]ased on the type of fees incurred, as well as the total initial estimated budget exceeding $10M, these fees should be treated as GAAP-only. In addition, these fees were treated as GAAP-only in Q1'18, which ensures consistent treatment in our assessment across periods." *Id.*

86.     Compounding these errors, the Officer Defendants knew that Symantec wholly lacked sufficient controls to ensure that expenses were properly classified as T&T costs. In February 2017, defendant Noviello was informed that an item must be at least $25 million to qualify for T&T

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

treatment, but "Technical Accounting assumes that as long as the total spend for an initiative/specific item is within the approved BoD amount that the detailed spend items are correctly classified." Securities Class Action, Dkt. 339, Ex. 111. Moreover, "[t]here isn't currently a process to audit each specific spend item on a monthly/quarterly basis to ensure the costs are correctly classified." *Id.* Likewise, defendant Clark was informed via a February 2017 email from Mr. Dildine that more than $20 million paid to accounting consultants was "being charged to T&T and integration so not hitting Non-GAAP." Securities Class Action, Dkt. 330, Ex. 58. The same email noted that "much of that classification is debatable." *Id.*

87.     These control issues persisted for months. In an email to defendant Noviello on September 8, 2017, Mr. Brown, Symantec's VP of Finance, stated his "unfiltered views" on the Company's Non-GAAP measures. Securities Class Action, Dkt. 330, Ex. 54. Brown underscored that Symantec's "non-GAAP policy whitepaper is not firmly grounded in guidance from the SEC" and that "[t]here are inconsistencies in our own policy." *Id.* As a result, "employees don't understand what can/cannot be classified as GAAP-only and why." *Id.* Worse yet, Symantec lacked "a review process of the actual expenses hitting GAAP-only accounts," so "nobody is reviewing what actually hits the accounts on a quarterly/monthly basis to ensure everything that's in there has actually been approved." *Id.*

88.     The lack of sufficient controls was by design. According to defendant Garfield, defendant Noviello did not know the technical accounting rules as to which expenses are appropriately considered transition costs, but he also "didn't like having [Garfield] around to keep telling him" of issues. Securities Class Action, Dkt. 337, Ex. 105. Defendant Noviello "doesn't object to anything Greg [Clark] says, he just tries to execute it. So he's (Nick) moved people into positions who would do the same thing…people who don't typically object." *Id.*

89.     Though Symantec engages KPMG LLP ("KPMG") as its independent accounting firm, KPMG did not audit or review Symantec's non-GAAP measures. Securities Class Action, Dkt. 331, Ex. 70. KPMG tested Symantec's restructuring, transition, and separation expense line item to confirm it was "recorded appropriately as operating expenses in accordance with U.S. GAAP," but did not evaluate whether those were properly excluded from non-GAAP measures nor whether they

1   were recurring expenses. *Id.* Its own workpapers state that "KPMG does not opine on the company's

2   non-GAAP treatment." *Id.*

3       90.     The Board was on notice of the improper accounting practices.  For example, on

4   August 7, 2017, defendant Garfield provided his exit interview to defendant Sands, a member of the

5   Audit Committee. Securities Class Action, Dkt. 337, Ex. 105. He stated that there was "pressure to

6   make Non-GAAP operating margin – there's an effort to expand the definition of Transition costs

7   and it's ridiculous." *Id.* He emphasized that "that what they (AC) need to worry about most." *Id.*

8   Defendant Garfield indicated that for the prior 2 months, "the technical accounting team has been

9   re-classifying, and taking things out (of Non-GAAP numbers)," such as the costs of moving some

10  of Symantec's accounts receivable team to India. *Id.* Defendant Sands inquired whether this was

11  "strictly a compliance issue relative to our 10k and/or policies," and defendant Garfield reminded

12  that changing the definition would require Symantec to restate prior results. *Id.* Moreover, "[y]ou

13  can't say some training stays in GAAP and some is Non-GAAP." *Id.* As a result, "figuring out [a]

14  restatement would be impossible because we don't track that way. The SEC just wouldn't believe

15  training is a one-time cost." *Id.*

16      91.     However, the Board continued to approve T&T costs without implementing requisite

17  controls to ensure they expenses were properly classified. According to an October 31, 2017

18  presentation, "non-GAAP financial measures, T&T expense and forecasts are included in every

19  financial review with the Board of Directors, for current quarter results and rest of year plan, as well

20  as Board approved annual plan." Securities Class Action, Dkt. 339, Ex. 113. In particular,

21  "Integration/Transformation program results and plans [are] also reviewed at every Board meeting."

22  *Id.* Similarly, a November 2017 email between defendants Clark and Noviello stated that

23  "Ultimately the T&T programs are board approved and board reviewed each quarter." Dkt. 339, Ex.

24  114.

25      92.     Adjusted revenue and adjusted operating income, both of which Defendants

26  manipulated, impacted other reported metrics.  Adjusted operating margin, which measures

27  profitability, is the quotient of operating income and revenue. Adjusted EPS, which reflects the

28  profit allocable to each share of common stock, depends on operating income (i.e., EPS = Operating

AMENDED COMPLAINT

Income – Preferred Dividends / Weighted Average Common Shares).  Therefore, Defendants caused the Company to issue misleading adjusted operating margin and adjusted EPS.

> **3.**    **The Board Regularly Discussed Non-GAAP Measures, Deferred Revenue, and Transition Costs**

93.    On August 1, 2016, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, Laybourne, Hao, Humphrey, Miller, Mahoney, and Schulman were present for an Audit Committee meeting during which defendant Garfield provided an accounting update.  Defendant Garfield presented information warning the Audit Committee of potential accounting issues with the newly-installed management: (i) that "significant pre-close activities include: . . . ensuring sufficient controls exist at BC [Blue Coat] for Day One;" and (ii) that "the most significant change" to implement the new revenue recognition standard ASC 606 would require a "shift in emphasis on value delivery for performance obligations."  Defendants Unruh, Dangeard, Sands, Vautrinot, Clark, Laybourne, Hao, Humphrey, Miller, Mahoney, and Schulman were apprised of the risks to ASC 606 adoption including those involving Blue Coat integration, availability of accounting resources, lack of IT resources to support critical system updates and implementation, and data quality concerns.

94.    On August 2, 2016, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, Laybourne, Hao, Humphrey, Miller, Mahoney, and Schulman were present for a two-day Board of Directors meeting during which defendant Noviello provided a "Blue Coat Integration Update" and noted that they would "not be able to reconcile Non-GAAP guidance to GAAP at this time because the purchase accounting impacts to Blue Coat's deferred revenue are not yet known (i.e., the deferred revenue haircut)."

95.    On August 5, 2016, defendants Unruh, Dangeard, Humphrey, Sands, and Vautrinot were present for an Audit Committee meeting during which they discussed pending litigation arising from its contract with the U.S. government.  Specifically, the lawsuit concerned the Company's compliance with certain provisions related to pricing, country of origin, and the disclosure of commercial sales practices.  Thus, the Audit Committee members were aware that they must pay close attention to the Company's accounting and financial reporting.

96.     On October 31, 2016, defendants Unruh, Dangeard, Humphrey, Sands, and Vautrinot were present for an Audit Committee meeting during which they discussed the impact of the Blue Coat acquisition to the Company's financial results.  Specifically, defendants discussed that "T&T [transition and transformation] expenditures expected to exceed Board Approved Range" and that the "executive team is requesting approval of a revised Transition and Transformation plan with an expense range of $110M to $140M."  They also reviewed deferred revenue in the context of current liabilities: "$255M increase [in deferred revenue] due to the acquisition of Blue Coat deferred revenue" had resulted in a $70 million quarter-over-quarter increase; a $152 million decrease year-to-date; and $784 million decrease year-over-year to deferred revenue.

97.     During the same meeting, defendants also discussed and reviewed certain questions from the SEC concerning, among other things: (i) "the ongoing impact of changes to [the Company's] renewal practices" to a decrease in revenue; (ii) the relative contribution of each factor "underlying a variance in cost of revenues;" and (iii) any changes to the Company's contractual obligations resulting from an addition $1 billion debt borrowed during the quarter. The last item specifically referenced Regulation S-K, the relevant reporting requirements for a public company.

98.     During the same meeting, Martin Espinosa ("Espinosa"), the Company's Chief Audit Executive, provided the Audit Committee with an update on internal audit matters, "including management of Blue Coat integration related risks on a go-forward basis and SOX compliance process and controls."  Espinosa "responded to questions from the Committee based on the Committee's review of the materials provided."  Defendant Garfield discussed "the treatment of deferred revenue from the Blue Coat acquisition, the SEC comment letter received by the Company and the resolution of the issues raised in the letter."  Moreover, the Audit Committee "requested that it receive copies of comment letters going forward."

99.     On November 4, 2016, defendants Unruh, Dangeard, Sands, and Vautrinot were present for an Audit Committee meeting during which defendant Garfield provided an accounting update, including Blue Coat acquisition activities and summaries of key observations for Symantec and Blue Coat.

100.　On November 15, 2016, defendants Clark, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, Vautrinot, and Noviello were present for a Board call during which they noted that "deferred revenue could be written down by 65% in acquisition accounting (to $66 million as of September 2016)."

101.　On January 30, 2017, defendants Unruh, Dangeard, Humphrey, Sands, Vautrinot, Clark, Laybourne, Hao, Miller, Mahoney, and Schulman were present for an Audit Committee meeting during which they reviewed and discussed financial metrics for third quarter 2017. Specifically, they noted that "Total Non-GAAP Revenue increased 20% due to Blue Coat contribution" and that "ES [Enterprise Segment] revenue outperformance driven by higher than expected bookings and higher than expected yield on bookings.  Blue Coat revenue impacted by lower yield due to cross sell and CASB resulting in more ratable revenue recognition, plus large unshipped JPMorgan order."  Furthermore, defendants would "continue[ to] focus on expense management" but "revenue growth lags bookings growth due to deferred revenue recognition." Moreover, defendants noted that "yield represents the amount of in-period billings that are recognized as revenue in-period" and that the "key drivers of yield include the mix of up front license vs. ratably recognized bookings, linearity of renewal bookings, discounting, and shift to subscription."

102.　During the same meeting, defendants discussed a "$180M Short-term vs. Long-term reclassification error from Q2'17."  Required quarterly payments for a loan had not been recorded as current payables, and defendants noted that "a new control [was] being implemented to require tie outs of debt payments to prevent this error in the future."

103.　During the same meeting, defendants reviewed a report by KPMG which noted that there was a risk with manual, rather than automated, deferred revenue accounting because such transactions "can be complex in nature and involve a high level of management judgment."

104.　On January 31, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot were present for a Board meeting during which defendant Noviello presented a "CFO Update" including fiscal 2018 planning, integration and transformation update, and details regarding the LifeLock acquisition.  In his summary of the

1   last update on December 16, 2016, defendant Noviello reviewed that there had been "no material

2   change at that time to base business outlook from November 1." Moreover, he stated that they had

3   discussed "$230M of cost takeout required, and immediate actions [the Company] would be taking."

4          105.    During the meeting, defendant Noviello, "referring to materials previously provided

5   to the Board which the Board acknowledged having had reviewed," presented an overview of FY18

6   planning outlook on a non-GAAP revenue and operating income basis. Defendant Noviello noted,

7   when referring to "Renewals Integration," an item for "deferred revenue conversion." Defendant

8   Noviello also reviewed Symantec's "non-GAAP Reconciliation" which was a detailed table

9   outlining the items added to GAAP revenue, operating income, and net income to produce non-

10  GAAP metrics; specifically, the Board was informed that restructuring, separation, and transition

11  costs impacted non-GAAP operating income. Defendant Noviello also provided "a summary of the

12  status of the Blue Coat Integration and major deliverable thereunder, as well as major

13  accomplishments to date and the go-forward plan."

14         106.    On March 9 and 10, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne,

15  Mahoney, Miller, Sands, Schulman, Unruh, Vautrinot, and Noviello were present for a Board

16  meeting during which they discussed the Company's fiscal 2018 financial plan and three-year

17  outlook. Then, after defendants Clark and Noviello left the meeting, the remaining Board members

18  "discussed the financial metrics for measuring performance against the FY18 Financial Plan and the

19  PRU/VCP awards . . . , and noted that the Board would need to retain discretion in determining the

20  awards under the VCP to take into account the impact of one-time or unusual events, such as . . .

21  certain one-time expenditures for transition and transformation projects . . . , which could affect the

22  adjusted operating income and operating margin metrics under the VCP." The Board approved the

23  FY18 financial plan and compensation plan and "reserve[d] the right to approve all adjustments

24  made to GAAP operating income to determine non-GAAP operating income for the purpose of

25  determining awards under the VCP . . . such as . . . . certain one-time expenditures for transition and

26  transformation projects . . . ."

27         107.    On March 13, 2017, defendants Dangeard, Humphrey, Sands, Unruh, Vautrinot,

28  Noviello, and Garfield attended a special Audit Committee meeting where they discussed

1  Symantec's transition to a new revenue recognition accounting standard, ASC 606. They discussed,

2  among other things, "the high impact areas for the new standard, which include timing for revenue

3  recognition, transition to relative selling price allocation and stand-alone selling price and new

4  disclosure requirements in the Company's SEC filings."

5          **C.     Defendants Knowingly Caused the Company to Issue Misleading Statements**

6          108.    On May 8, 2017, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, Laybourne,

7  Hao, Mahoney, and Schulman were present for an Audit Committee meeting during which they

8  reviewed the Company's financial update as presented by defendant Noviello.  During an executive

9  summary that included "Updates from 3/9 Board Meeting," defendant Noviello stated that



16         109.    The Audit Committee reviewed a table of "FY18 Non-GAAP to GAAP

17  Reconciliation" that detailed the "significant and consistent difference between Non-GAAP and

18  GAAP EBIT margins," partly due to an "increase in [a]mortization of intangible assets due primarily

19  due to BC and LL acquisitions."  In addition, the Audit Committee reviewed deferred revenue (non-

20  GAAP) trends, including that "72% of FY18 revenue rolling off balance sheet."  Defendant Noviello

21  also remarked that "Non-GAAP deferred revenue includes remaining deferred revenue purchase

22  accounting haircut of $105M for Blue Coat and $62M for LifeLock as of the end of FY17 and $44M

23  for Blue Coat and $0M for LifeLock as of the end of FY18" and that that "FY17 ending deferred

24  revenue balance includes $521M of Blue Coat and $203M of LifeLock non-GAAP deferred

25  revenue."

26         110.    The Audit Committee reviewed and discussed "supporting documents filed with the

27  SEC to explain how [the Company] compl[ies] to avoid the potential problem areas" identified by

28  SEC comments regarding non-GAAP measures. Furthermore, the Audit Committee understood that

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

"the SEC finds the use of terms such as 'non-recurring' and 'one-time' and even 'non-cash' to typically be inappropriate[, so the Company] ensured that . . . such terms are never included in any materials . . . file[d] with the SEC."

111.    The Audit Committee also reviewed a disclosure for the revenue adjustment due to the Blue Coat acquisition, which stated:

> Disclosure discussing Revenue adjustment: "<u>Deferred revenue fair value adjustment</u>: We define non-GAAP net revenues as net revenues excluding the impact of purchase accounting. We regularly monitor these measures to assess its operating performance. On August 1, 2016, in connection with the Symantec acquisition of Blue Coat, Inc. ("Blue Coat"), and on May 22, 2015, as part of the Bain Capital Investors, LLC ("Bain") acquisition of Blue Coat, the deferred revenue balances from Blue Coat products were required to be written down due to purchase accounting in accordance with GAAP. The impact on revenues related to purchase accounting as a result of these transactions, particularly as a result of the Symantec acquisition of Blue Coat, limits the comparability of revenues between periods. While the deferred revenue written down in connection with the acquisitions will never be recognized as revenues under GAAP, we do not expect the Symantec or Bain acquisition of Blue Coat to have an impact on future renewal rates of the contracts included within the deferred revenue write-down, nor do we expect revenues generated from new service and subscription contracts to be similarly impacted by purchase accounting adjustments. Accordingly, we believe ***presenting non-GAAP net revenues to exclude the impact of purchase accounting adjustments, including the deferred revenue write-down, aids in the comparability between periods and in assessing our overall operating performance.*** Without these adjustments, it would be difficult for investors to assess our financial performance and trends. Non-GAAP net revenues has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for GAAP net revenues. Other companies in our industry may calculate this measure differently, which may limit its usefulness as a comparative measure.

112.    On May 10, 2017, Defendants caused Symantec to issue a press release announcing its fourth quarter and fiscal year 2017 results, which stated: "Q4 GAAP revenue $1.115 billion, up 28% year over year"; "Fiscal Year 2017 (FY17) GAAP revenue $4.019 billion, up 12% year over year"; "Q4 Enterprise Security segment GAAP revenue up 40%; [and] FY17 Enterprise Security segment GAAP revenue up 22%."

113.    In the press release, defendant Clark specifically attributed the Company's revenue growth to the successful integration of Blue Coat: "***The industrial logic of combining Symantec and Blue Coat is proving out***, with Enterprise Security growing organically year over year and Blue Coat cloud subscription revenue growing 67%. . . .***We are on-track to deliver long-term, sustainable growth and industry-leading profitability as the new Symantec***."

114.     On May 19, 2017, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, and Humphrey, as well as defendants Noviello and Garfield, were present for an Audit Committee meeting during which they reviewed and discussed "significant" deficiencies related to the FY 2017 10-K.   Defendant Garfield noted that in Q4 2017, "the Company initially recorded $13.7m of a restructuring charge that should not have been recorded, but the error was caught prior to the issuance of the press release and reversed."   The deficiency occurred because the "GL analyst" who reviewed all restructuring charges "was *overwhelmed by the volume and complexity of non-GAAP activity* (over $300m in Q4 alone)."  To address the deficiency, defendant Garfield noted that the Company would "increase the experience level and number of employee accountants involved in the planning, recording and analyzing of these balances as the expected volume in FY18 is over $1 Billion."  Additionally, the Company had "misstated Cash Flow from Investing Activities and Cash Flow from Operations by an equal amount for 5+ years" but the deficiency had not been detected until the week of the meeting.

115.     Moreover, defendants who were present for the meeting reviewed and discussed guidance on the use of non-GAAP measures.  Defendant Garfield noted that the "*difference between GAAP and non-GAAP has increased dramatically*, driven by stock comp and amortization."  They noted, however, that "categories of non-GAAP expenses used by SYMC is consistent year over year" and "[w]e spend a considerable amount of time auditing what is in the accounts and are increasing the level of review in FY18." Furthermore, defendant Garfield remarked that "increasing levels of complexity in business practices and processes while decreasing the availability of resources is contributing to late entries, a significant deficiency and audit adjustment in the second half of FY17."  Among other things, the two major acquisitions of Blue Coat and LifeLock increased the complexity.

116.     During the May 19, 2017 Audit Committee meeting, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, and Humphrey, as well as defendants Noviello and Garfield, discussed the "Q3 earnings release and supporting documents filed with the SEC to explain how [Symantec] compl[ies] to avoid the potential problem areas" outlined in the SEC's comments in May 2016.

Specifically as to "misleading adjustments, such as exclusion of normal, recurring cash expenses," these defendants reviewed:

> We have controls in place to prevent the inclusion of normal, recurring cash expenses as well as maintain the consistent treatment of expenses from period to period as defined in our SEC filings

- Example of definition of non-GAAP Transition Costs in Q3 FY17 filing:

> "Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.["]

- Technical accounting reviews all requests to classify an expense to a GAAP only account

   o The accounting organization selects and samples expenses classified as GAAP only to ensure compliance with Technical Accounting's directives

   o As a result of increasing volume and risk, we are adding a resource to audit 100% of GAAP only expenses in FY 18.

117.   At the same meeting, regarding revenue recognition methods, defendants Unruh, Dangeard, Sands, Vautrinot, Clark, and Humphrey, as well as defendants Noviello and Garfield discussed:

- We ensured our the [sic] non-GAAP adjustment to deferred revenue was consistent with the methodology previously used at SYMC as well as by SEC filers in multiple industries

> Disclosure discussing Revenue adjustment: "Deferred revenue fair value adjustment: We define non-GAAP net revenues as net revenues excluding the impact of purchase accounting. We regularly monitor these measures to assess its operating performance. On August 1, 2016, in connection with the Symantec acquisition of Blue Coat, Inc. ("Blue Coat"), and on May 22, 2015, as part of the Bain Capital Investors, LLC ("Bain") acquisition of Blue Coat, the deferred revenue balances from Blue Coat products were required to be written down due to purchase accounting in accordance with GAAP. The impact on revenues related to purchase accounting as a result of these transactions, particularly as a result of the Symantec acquisition of Blue Coat, limits the comparability of revenues between periods. While the deferred revenue written down in connection with the acquisitions will never be recognized as revenues under GAAP, we do not expect the Symantec or Bain acquisition of Blue Coat to have an impact on future renewal rates of the contracts included within the deferred revenue write-down, nor do we expect revenues generated from new service and subscription contracts to be similarly impacted by purchase accounting adjustments. Accordingly, we believe presenting non-GAAP net revenues to exclude the impact of purchase accounting adjustments, including the deferred revenue write-down, aids in the comparability between periods and in assessing our overall operating performance. Without these adjustments, it would be difficult for investors to

AMENDED COMPLAINT

assess our financial performance and trends. Non-GAAP net revenues has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for GAAP net revenues. Other companies in our industry may calculate this measure differently, which may limit its usefulness as a comparative measure.

- We also avoid individually tailored measurement methods such as our unique and annually changing definition of bookings

118.    On July 31, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, Vautrinot, Noviello, and Garfield were present for an Audit Committee meeting during which they reviewed, among other things, the Company's current liabilities, including a $48 million decrease in deferred revenue "due to Blue Coat billings, offset by the rolloff of the haircut balance" and a $41 million increase "due to LifeLock deferred revenue, including rolloff of haircut balance."

119.    On August 2, 2017, Defendants caused Symantec to issue a press release announcing its first quarter 2018 results, which stated: "Q1 GAAP revenue $1.175 billion, up 33% year over year."

120.    On August 4, 2017, defendants Clark, Dangeard, Humphrey, Sands, Unruh, Vautrinot, as well as Defendants Noviello and Garfield, were present for an Audit Committee meeting during which they reviewed and approved the Form 10-Q for Q1 2018.  Specifically, the Audit Committee represented that "there was no fraud involving management or other employees having a significant role in internal controls," despite their knowledge of a "41M increase [to deferred revenue] due to LifeLock deferred revenue, including rolloff of the haircut balance" and a "48M decrease [to deferred revenue] due to Blue Coat billings, offset by the rolloff of the haircut balance."  They also approved the representation that the 33% increase in revenue was primarily attributable to the acquisitions of Blue Coat and LifeLock.  The Audit Committee also approved the representation that "gross margin decreased five percentage points primarily due to $53 million of revenue [that was] excluded as a result of the revaluations of LifeLock and Blue Coat deferred revenue to fair value at the time of the acquisitions and increased amortization expense of $49 million primarily related to the acquired Blue Coat and LifeLock intangible assets."

121.    On August 4, 2017, Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017, which stated: "Revenue increased by 33%, driven by a 34% and 31% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock')."

122.    On October 30, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot, as well as Defendant Noviello, were present for an Audit Committee meeting during which they reviewed and discussed that Enterprise Segment "revenue down 1% YoY in constant currency, adjusted to include the contribution of acquisitions." They also reviewed and discussed that "revenue flat YOY vs. planned growth of 3%, impacted by . . . shortfall of deferred revenue roll-off coming into the quarter [and] shortfall in product bookings."   Furthermore, defendants noted that, for Website Security in the Enterprise Segment, "revenue declined 7% year-over-year, impacted by bookings miss in prior quarters." Additionally, defendants reviewed and discussed the impact to deferred revenue during the quarter, including a $98 million "decrease due to continued amortization of BC deferred revenue" as well as a separate "Blue Coat, LifeLock, and ███████ Haircut Analysis [that provided] additional information."   Finally, defendants reviewed and discussed a detailed table outlining the "deferred revenue haircut waterfall" by quarter and by fiscal year.

123.    On October 31, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh and Vautrinot were present for a Board meeting during which Defendant Noviello "reviewed the Company's 1HFY18 performance and the FY18 annual financial plan, including updates for acquisitions and the Website Security divestiture and the implications of the updated plan for the Company's compensation plans, as presented the prior day to the Audit Committee of the Board of Directors."   The Board reviewed and approved the FY18 annual financial plan.   During the meeting, Noviello discussed the usage of Non-GAAP financial measures.   According to the minutes, EY had been engaged in September to study the "usage, policies, and controls related to [non-GAAP measures]," and the Board was informed as to the initial results of EY's work and "remedial activities the Company ha[d] completed to date and will take in

the next two quarters."  The Board "requested that the Audit Committee be provided an additional level of detail on the Transition & Transformation accounts (T&T) and non-GAAP items in future updates."

124.    On November 1, 2017, Defendants caused Symantec to issue a press release announcing its second quarter 2018 financial results, which stated: "Q2 GAAP revenue $1.240 billion, up 27% year over year."

125.    On November 3, 2017, Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended September 29, 2017, which stated: "Revenue increased by 27%, driven by a 20% and 37% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, *primarily due to the contributions from the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock'), respectively*."

126.    Neither the Form 10-Q nor the earnings release filed on November 1, 2017 disclosed the retention of EY.

127.    On November 16, 2017, Defendants Unruh, Dangeard, Miller, Sands, Vautrinot, Clark, Hao, Mahoney, and Noviello were present for an Audit Committee meeting during which the sole item on the agenda was a discussion of EY's work on non-GAAP measures.   EY's initial benchmarking analysis comparing Symantec's 1Q18 report against 37 peers and SEC materials "showed that *Symantec is an outlier in terms of the number of NGMs* [Non-GAAP Financial Measures] in comparison to [its] peers and *does not comply to some of the SEC guidance on usage and reconciliations to GAAP*." Securities Class Action, Dkt. 328, Ex. 52. Defendants also discussed that "EY noted that [Symantec's] guidelines, processes and controls around NGMs and T&T costs are not detailed and processes not fully memorialized, and as such, *there is a risk around completeness and accuracy of our non-GAAP reporting*." *Id.* Based on these findings, Symantec "implemented several changes in [its] NGM usage" and "[f]urther review of [its] policies and internal controls and identification [would] be performed in Q3, *with focus on T&T project costs.*" *Id.*

128.    During the November 16, 2017 meeting, defendant Noviello presented a "Non-GAAP Measures Bridge to Financial Statements."  Defendants Unruh, Dangeard, Miller, Sands,

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                                    33

Vautrinot, Clark, Hao, and Mahoney reviewed materials provided by Defendant Noviello regarding non-GAAP adjustments, which stated in relevant part:

> Current non-GAAP adjustments impact 47 instances in our financials, most of which have been in place since at least FY15 and prior. Total number of lines impacted has remained relatively consistent, ***as new non-GAAP adjustments (i.e. deferred revenue fair value adjustment and acquisition & integration costs)*** have replaced others that were previously disclosed (i.e. EDS & NDI contingency and unallocated corporate charges).

129.   Defendant Noviello also explained that "Symantec has a long history of significant non-GAAP adjustments."  He further noted:

> Some non-GAAP measures are derived directly from GAAP values and are commonly excluded from non-GAAP earnings (e.g. stockbased compensation and amortization of intangibles), while ***others are more judgmental in nature (e.g. unallocated corporate charges, transition costs, and integration costs).*** Based on the judgment involved in deriving the values, we've ranked the judgmental nature of these measures as Low, Moderate, or High.

130.   The meeting attendees discussed the explanations and judgments for various adjustments to reach non-GAAP measures. Regarding the "Deferred Revenue Haircut," they discussed:

> Explanation of adjustment
>
> From Q2FY18 Earnings Release 8-K Exhibit A
>
> <u>Net revenues:</u> Our non-GAAP net revenues eliminates the impact of the Blue Coat and LifeLock deferred revenue purchase accounting adjustments required by U.S. GAAP. U.S. GAAP requires an adjustment to the liability for acquired deferred revenue such that the liability approximates how much we, the acquirer, would have to pay a third party to assume the liability. We believe that eliminating the impact of this adjustment improves the comparability of revenues between periods. Also, although the adjustment amounts will never be recognized in our U.S. GAAP financial statements, we do not expect the acquisitions to affect the future renewal rates of revenues excluded by the adjustments. In addition, our management uses non-GAAP net revenues, excluding the impact of purchase accounting adjustments to assess our operating performance and overall revenue trends. Nevertheless, non-GAAP net revenues has limitations as an analytical tool and should not be considered in isolation or as a substitute for U.S. GAAP net revenues. Additionally, other companies in our industry may not calculate these measures in the same manner which may limit their usefulness for comparative purposes.
>
> Applicable for US GAAP – Yes for purchase accounting purposes, but not for adjustment to revenue
>
> Level of Non-GAAP Judgment – Low

131.     They also discussed that there was a "High" level of Non-GAAP judgment for transition costs. Specifically, they discussed:

Explanation of adjustment

From Q2FY18 Earnings Release 8-K Exhibit A

Restructuring, transition and other: We have engaged in various restructuring activities over the past several years which have resulted in severance, facilities and other exit and disposal costs, including asset write-offs. We have also engaged in various transition and other activities which resulted in related costs primarily consisting of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes, as well as costs associated with our divestitures of product lines. Each restructuring, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, each has differed from the other sin terms of its operational implementation, business impact and scope, and the amount of these charges has varied significantly from period to period. We believe that it is important to understand the impact of these activities and that investors benefit from the presentation of non-GAAP financial measures excluding these charges to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.

Applicable for US GAAP – Restructuring, yes, accounting and disclosure guidance. Transition and Transformation, no.

Level of Non-GAAP Judgment – Low for restructuring (severance, termination costs, exit and disposal costs, and related asset write offs). Moderate for separation costs, **High for transition costs**

Controls and Calculation Method –

Restructuring: Specific accounting, controls, and balance sheet accounts.

T&T: Technical accounting provides guidance on projects that qualify for T&T classification. Amounts are checked for approval and reviewed by Accounting.

132.     In particular, there was a "High" risk of "Non-compliance with SEC Guidance for Non-GAAP Presentation" as to several projects, including Project Ascent, Project Athena, Subscription Platform (or 3S), and Network Infrastructure upgrade.

133.     During the meeting, Defendants Unruh, Dangeard, Miller, Sands, Vautrinot, Clark, Hao, and Mahoney reviewed a presentation by EY on non-GAAP measures and SEC regulatory guidance.  Specifically, the Board reviewed materials highlighting the increased scrutiny by the SEC of non-GAAP measures ("NGMs") including on "increased use of NGMs by companies in filings and other mediums; the nature of adjustments included within NGM reconciliations; the increasingly large variances between amounts reported under GAAP and the NGM itself; and the

lack of adequate disclosures over a NGM's use and purpose for inclusion."  Moreover, the Board was informed that "the SEC staff has asked companies to explain how their use of NGMs complies with SEC guidance, including . . . questioning the tailoring of GAAP recognition and measurement principles, such as those to accelerate revenue."

134.    Regarding transition costs, Defendants observed that "T&T costs could be challenged as being normal or recurrent costs due to the nature of the costs and to the frequency of such adjustments."  Though Symantec discloses that "each T&T activity is a 'discrete event based on a unique set of business objectives or circumstances,'" they recognized that "the recurring basis in which Symantec adjusts for these charges may bring about a comment letter challenging why these charges are 'not normal, recurring cash operating expenses.'"  In fact, *only 2 of 38 peer companies adjust for T&T costs.*

135.    Furthermore, EY noted that "an almost full non-GAAP income statement is presented in the [Company's] Press Release," but that "SEC guidance prohibits this presentation in SEC filings and SEC staff has issued comment letters to companies."  EY advised "Symantec [to] consider discontinuing this presentation and move the information to supplementary information presented in its website."  EY further noted that "Symantec revised its presentation in the Q2 2018 press release to no longer present an almost full non-GAAP income statement."  The Company's Q2 2018 press release noted that "NGMs for gross margin and operating expenses were removed and the revised presentation is as summarized . . . ."

136.    Finally, EY made several recommendations as to the accounting treatment of earn outs from acquisitions.  The Board was informed that "Symantec may conclude to adjust GAAP measures for aspects related to earn outs from acquisitions and/or the remeasurement of contingent consideration within the reconciliation of its NGMs[, but the Company must] ensure disclosures are robust enough that a clear rationale for the adjustment is discussed and that the adjustment is balanced (i.e. does not only exclude losses/costs, but also excludes any corresponding gains/income)."  Also, EY warned that "SEC comment letters also challenged companies for adjusting earn outs from acquisitions when companies were particularly acquisitive or indicated that is part of their strategy."  As a result, EY recommended that the Company "should consider whether

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

the nature of an earn out from an acquisition is based on its operating results or other factors in determining whether to include as an adjustment to its NGMs" and "should provide sufficient disclosure of the earn out arrangement to explain why the adjustment provides meaningful information to its investors."

137.    On December 20, 2017, defendants Clark, Dangeard, Humphrey, Sands, Schulman, Unruh, Vautrinot and Noviello were present for an Audit Committee meeting during which Fenwick & West LLP reviewed and discussed its "analysis of the Company's use of non-GAAP financial measures, including the materials and periods reviewed, the scope of the compliance and risk review performed, observations and recommendations based on the observations."

138.    On January 31, 2018, Defendants caused Symantec to issue a press release announcing its third quarter 2018 financial results, which stated: "Q3 GAAP revenue $1.209 billion, up 16% year-over-year."

139.    On February 2, 2018, Defendants caused Symantec to file its quarterly report on Form 10-Q with the SEC for the period ended December 29, 2017, which stated: "Revenue increased by 25% compared to the corresponding period in the prior year, driven by a 15% and 38% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the contributions from the acquisitions of Blue Coat and LifeLock."

**D.    The Truth Slowly Emerges**

**1.    Symantec Announces an Internal Investigation Into Accounting Issues**

140.    On May 10, 2018, Symantec issued a press release announcing its fiscal fourth quarter 2018 earnings, in which it disclosed that the Audit Committee had commenced an internal investigation due to concerns raised by a former employee.  The press release also stated that the Company retained independent counsel and other advisors to assist with the investigation and that the Company had voluntarily contacted the SEC and would provide additional information to the SEC as the investigation proceeded.  As a result of the ongoing investigations, the press release qualified the reported results by stating that the "financial results and guidance may be subject to change" and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                                    37

141.   In appendix A of the press release, which was concurrently filed with the SEC, Defendants no longer described "transition costs" as "continuing."  Instead, Defendants attempted to justify the removal of such transition costs in calculating the Company's adjusted operating income:  "We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance."

142.   The same day, Symantec held a conference call with investors during which Defendant Noviello "forecast[] year-over-year decline in Enterprise Security revenue [and flat year-over-year revenue for the total company that was] primarily attributed to a lower mix of business yielding in-period revenue and other contributors, including increased contract duration and timing of maintenance renewals."

143.   On this news, the Company's stock price fell $9.66 per share, or more than 33%, to close at $19.52 per share on May 11, 2018.

144.   On May 14, 2018, Defendants caused Symantec to release an updated statement regarding the Audit Committee's ongoing internal investigation:

> The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee regarding the Company's public disclosures including commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation. The Audit Committee has retained independent counsel and other advisors to assist it in its investigation. The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds. The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation. The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner. At this time, the Company does not anticipate a material adverse impact on its historical financial statements.

145.   The same day, Symantec hosted a conference call with investors to provide "more information" about the internal investigation and the Company's fiscal year 2019 financial guidance and fiscal year 2020 financial outlook.  During the call, Clark stated that: "For anyone concerned about executive compensation at this time, I want to let you know that all discretionary and

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

performance-based compensation for named executive officers is on hold pending the outcome of the Audit Committee investigation."  Defendant Noviello stated that during the investigation, the Company would not repurchase any shares.  When asked by a financial analyst to confirm that the Company did not anticipate any material adverse impact to its financials, Clark could not so confirm.

146.    On May 14, 2018, *Probes Reporter* published an article alleging that the SEC had been investigating Symantec as early as April 17, 2018—contradicting Defendants' claims that they had voluntarily contacted the SEC regarding the whistleblower's expressed concerns. The *Probes Reporter* published a letter dated April 17, 2018 that it had received from the SEC in response to a request for information concerning Symantec pursuant to the Freedom of Information Act.  In the letter, the SEC denied the request, explaining that it was withholding the information requested under federal exemptions protecting from disclosure records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities.

147.    On May 15, 2018, Paulo Santos ("Santos"), an analyst, wrote on *Seeking Alpha* that, given the recent disclosures, "[t]here's a good chance Symantec will find a level of exaggeration in the previously-used non-GAAP adjustments," including for recurring operating costs.[3]  Santos added:

> If Symantec finds that some non-GAAP adjustments were indeed not called for, their removal will still have consequences.  When you look at Symantec's earnings estimates, those are based on Symantec's non-GAAP reporting.  Were Symantec to remove some of those non-GAAP adjustments, and immediately it would start reporting lower non-GAAP earnings.  Even with no change to its historical financial statements and accounting practices. . . . Symantec was always pretty expensive (for a stagnated business) when it came to GAAP measures, and only the non-GAAP adjustments made it look more reasonable.

148.    On May 31, 2018, Defendants caused Symantec to announce that the Company had received a deficiency notice "from NASDAQ stating that, as a result of failing to timely file its annual report on Form 10-K for the year ended March 30, 2018, Symantec was not in compliance with NASDAQ [listing rules]."

---

[3] Paulo Santos, *Symantec: Parsing the Details*, Seeking Alpha (May 15, 2018), *available at* https://seekingalpha.com/article/4174098-symantec-parsing-details.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                           39

149.     On May 31, 2018, Credit Suisse analyst Brad Zelnick issued a report summarizing opinions of Ron Kiima, former assistant chief accountant for the SEC, who believed the investigation concerned the Company's non-GAAP adjustments, including those relating to restructuring, transition or other costs removed from Symantec's reported adjusted metrics.

150.     On August 2, 2018, Defendants caused Symantec to issue a press release announcing its first quarter 2019 financial results. The press release stated that, since the Audit Committee investigation remained ongoing, "fourth quarter of fiscal year 2018 and subsequent periods remain open periods from an accounting perspective, subject to adjustment for material updates." Moreover, Defendants attributed implied billings, which were below expectations, "to longer than expected sales cycles for large multi-product platform sales[, an] issue isolated to North America." Defendants also lowered revenue guidance for fiscal 2019 to a range of $4.64 billion to $4.76 billion, which fell short of median analyst estimates of $4.84 billion.

151.     On this news, the Company's stock price fell $1.63 per share, or nearly 8%, to close at $19.25 per share on August 3, 2018.

152.     On August 3, 2018, William Fitzsimmons of Morningstar Equity Research issued a report stating that, after "scour[ing] Symantec's financial results for irregularities . . . investors should be aware of the two speculative theories that could have triggered the audit":

> [W]e've noticed an expansion in the spread between both GAAP and non-GAAP results.  It seems the restructuring line item of its income statement has increased, and it could be in the realm of possibility that management may have inflated restructuring expenses, by placing expenses that would have typically been regular operating expenses into this line item.  Whether an expense falls in the restructuring line item versus regular operating expense (S&M, R&D, or G&A) has no bearing on GAAP profitability, but when calculating non-GAAP Net Income, restructuring expenses are added back into the results.  Thus, it is within the realm of possibility that management inflated the restructuring line item to produce a better-looking non-GAAP EPS metric, allowing the firm to hit stock-based compensation targets.

### 2.     Symantec Restates Financial Results Due to Improper Revenue Recognition

153.     On September 24, 2018, Symantec announced that its Audit Committee, independent legal counsel, and a forensic accounting firm, had concluded their internal investigation into Symantec's accounting practices.  The press release also disclosed that the SEC had commenced a formal investigation into Symantec's accounting.

154.    In the September 24, 2018 press release, Symantec admitted that it had recognized revenue in Q1 2018 and Q1 2019 that should have been deferred and that those financial statements would be restated accordingly:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period). After subsequent review of the transaction, the Company has concluded that *$12 million of the $13 million should be deferred*. Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) *will be revised to take into account this deferral and any other financial adjustments required as a result of this revision*.

155.    This $12 million downward revision was material. As a report by Watchdog Research noted:

> Any irregularities in accounting are material because they raise questions about the potential for failure or weakness in the personnel and/or systems used for a company's accounting. In [Symantec's] case, it might seem a $12 million revenue recognition issue would be immaterial. But that would be **false**. Symantec reported $49 million in operating income in 2018. If the $49 was reduced by the $12 million, that still means the $12 million had an impact of 20% on operating income – excluding any millions spent on the investigation!

156.    The $12 million revision was also material to Symantec's quarterly results. On May 10, 2018, Symantec had reported $958 million in gross profits for fourth quarter 2018; in the Form 10-K incorporating the restatement, gross profits had been reduced to $946 million, reflecting a dollar-for-dollar impact of the revenue deferral.

157.    The September 24, 2018 press release announced a massive corporate reshuffling and the need for improvements to its internal controls related to transition costs:

> The Audit Committee noted relatively *weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses.* The Audit Committee also observed that beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures.

> * * *

> The Audit Committee also reviewed certain allegations concerning, and identified certain behavior inconsistent with, the Company's Code of Conduct and related policies. The Audit Committee referred these matters to the Company for, and the Company intends to take, appropriate action.

> The Audit Committee proposed certain recommendations which the Board of Directors has adopted, including: appointing a separate Chief Accounting Officer;

appointing a separate Chief Compliance Officer reporting to the Audit Committee; clarifying and enhancing the Code of Conduct and related policies; *and adopting certain enhanced controls and policies related to the matters investigated.*

158.    According to an internal presentation dated October 25, 2018, Symantec had "2 Significant deficiencies and 1 control deficiency (CD) that were identified as a result of the AC investigation." Securities Class Action, Dkt. 337, Ex. 102. These significant deficiencies related to the intake of reporting potential Code of Conduct violations and to the process for executive representation letters. *Id.* Specifically, executive representation letters were not provided to the Revenue team, resulting in the misreporting of the Oracle transaction, and it was a "significant deficiency due to the dollar value and level of personnel involved." *Id.*

### 3.    In the Aftermath, Nearly All of the Former Blue Coat Executives Depart Symantec

159.    Soon after the news of improper accounting, nearly all of the executives associated with Blue Coat departed from Symantec.

160.    On November 29, 2018, Symantec announced that Michael Fey, President and COO, had resigned. Though his exit was characterized as a resignation, agreed: "to forego severance benefits or payments, rights to any unvested equity awards, and any cash bonus payments"; not to exercise, sell or transfer any shares subject to vested or exercisable options; and a 12-month non-compete clause. These terms raised suspicions that his departure was related to the Audit Committee's findings. Inf act, an RBC Capital Markets analyst report stated: "Overall we are surprised by the move, and to us it appears that *this was rather sudden and not a voluntary decision by Mr. Fey*."

161.    At the same time, two other executives left, but their departures were not announced with Fey's resignation. Specifically, Michael Williams, CMO, and Brandon Rogers, Senior Vice President, departed Symantec. A *Bloomberg* article published November 30, 2018 entitled "Three Executives Depart in Major Leadership Shuffle at Symantec" stated: "Symantec announced Thursday that President and Chief Operating Officer Michael Fey had resigned, but didn't publicize the other executive departures. . . . A company spokesman said Symantec wouldn't be making any further public comments on the executive changes."

162.   Then, on January 31, 2019, Symantec announced that defendant Noviello would leave Symantec to "pursue other opportunities." Though he would continue in his position until a successor is appointed, the market observed that "a spate of executive exits (the COO in November and now the CFO) while the audit committee review fades is not necessarily the most inspiring set of events for investors."

163.   On May 9, 2019, Symantec announced that defendant Clark would leave Symantec due to "personal issues" and wanting to "spend more time with his aging father." When asked whether the exit was due to any disagreement with the Board or connection to the pending investigations, interim CEO Richard Hill stated "And there's no connection, absolutely, to the investigation that I know of. At least no one's ever said that to me." Analysts drew attention to the careful answer, with Credit Suisse noting for example: "While Mr. Hill indicated Mr. Clark's departure was not due to any personal disagreement with him or any litigation that he was aware of, he stopped short of speaking on behalf of the entire board or denying any nexus with ongoing litigation or the company's still unresolved SEC investigation."

164.   On July 10, 2019, *Bloomberg* reported additional departures, including of former Blue Coat executives: Marc Andrews, Head of Global Enterprise Sales; Denny Young, Vice President of Operations at Enterprise Security; Bryan Barney, Senior Vice President ("SVP"), GM of Enterprise Security; Javed Hasan, SVP, Endpoint, IAAS & Datacenter products; and Steve Schoenfeld, SVP, Product Management.

**E.      Defendants Issue a Materially Misleading Proxy Statement**

165.   On August 16, 2017, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on October 5, 2017.  In the proxy statement, these eleven defendants solicited stockholder votes in favor of five management proposals, including: (i) a proposal to elect Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot to new terms as directors; and (ii) a proposal to approve an amendment, among others, to the Company's 2013 Equity Incentive Plan to increase the number of shares reserved for issuance thereunder by 8 million shares.

166. The 2017 proxy statement disclosed that the Board had determined that Clark was not an independent director. Regarding corporate governance, the proxy statement stated that "the Board is responsible for the general governance of our company, including selection and oversight of key management; and management is responsible for running our day-to-day operations." According to the proxy statement, the Board maintained an Audit Committee tasked with oversight of, among other things, the Company's accounting and financial reporting:

Audit Committee

Our Audit Committee oversees our company's accounting and financial reporting processes and the audits of our financial statements, including oversight of our systems of internal controls and disclosure controls and procedures, compliance with legal and regulatory requirements, internal audit function and the appointment, retention and compensation of our independent auditors. Its duties and responsibilities include, among other things, to:

- Review our company's quarterly and annual financial statements.

- Review the adequacy and effectiveness of our company's accounting and financial reporting processes.

- Appoint and, if necessary, terminate any registered public accounting firm engaged to render an audit report or to perform other audit, review or attest services for our company.

- Review and approve processes and procedures to ensure the continuing independence of our company's independent auditors.

- Review the internal audit function of our company, including the independence and authority of its reporting obligations and the coordination of our company's internal audit function with the independent auditors.

- Review our company's practices with respect to risk assessment and risk management and meet with management and members of internal audit to discuss our company's significant risk exposures and the steps management has taken to monitor, control and mitigate such exposures.

- Review our company's ethics compliance program, including policies and procedures for monitoring compliance, and the implementation and effectiveness of our company's ethics and compliance program.

167. The proxy statement disclosed: "Executive Annual Incentive Plan [("AIP")] targets are established within the first 90 days of each plan year." Because Symantec's fiscal year begins in March, the incentive compensation targets are normally set by the end of June.

168. According to the proxy statement, the Board used non-GAAP operating income and non-GAAP revenue to establish incentive compensation targets under the AIP: At the end of each

fiscal year, the Compensation Committee reviewed actual performance against the AIP targets "after making any appropriate adjustments to such measures for the effects of corporate events that were not anticipated in establishing the performance measures."  Specifically:

> Consistent with the presentation in our quarterly earnings releases and supplemental materials, under our executive compensation programs, we define (i) non-GAAP operating income as GAAP gross profit less operating expenses, adjusted to exclude stock-based compensation expense, charges related to the amortization of intangible assets, restructuring, separation, transition and other related expenses, acquisition and integration expenses, the impact from inventory fair value adjustments as part of business combination accounting entries and certain other income and expense items that management considers unrelated to Symantec's core operations including non-GAAP revenue adjustments; and (ii) non-GAAP revenue as GAAP revenue adjusted to exclude certain litigation contingencies and settlements, and the impact from deferred revenue fair value adjustments as part of business combination accounting entries. For purposes of calculating achievement of both metrics, foreign exchange movements were held constant at plan rates, pursuant to the terms of the plans. In prior fiscal years, we have also used non-GAAP earnings per share ("EPS") as a performance metric.

169.    The proxy statement disclosed the following tables regarding the regarding the 2017 targets:



170.    When the Company reported its fiscal 2017 results on May 10, 2017, it disclosed fiscal 2017 non-GAAP revenue of $4,163 million and fiscal 2017 non-GAAP operating income of $1,194 million.

171.    According to the proxy statement, the "actual" non-GAAP results used to determine AIP payout differed from what Symantec reported in May 2017 and were:

| | Target ($)(millions) | Actual ($) (millions) | Achievement (%) | Funding (%) |
|---|---|---|---|---|
| Operating Income | 1,143 | 1,197 | 104.7 | 125.8 |
| Revenue | 4,040 - 4,120 | 4,086 | 100 | 100.0 |
| Fiscal 2017 Funding | | | | 111.5 |

172.    The Company's reported non-GAAP revenue was $4,163 million, but the adjusted non-GAAP revenue number used for the AIPs was $4,086 million, representing a $77 million downward adjustment, the source of which was not disclosed.  At the adjusted non-GAAP revenue number of $4,086 million, Symantec's executives achieved 100% funding for the revenue metric.

173.    However, when set by the Compensation Committee, these targets did not account for the impact of acquiring LifeLock, Inc. ("LifeLock") on non-GAAP revenue and non-GAAP operating income.  According to the proxy statement, the Compensation Committee adjusted the incentive compensation goals due to the Blue Coat acquisition in December 2016, but not again when LifeLock was acquired:

> In fiscal 2017, Symantec deviated somewhat from its typical goal-setting practices as a result of the Blue Coat acquisition. As part of the acquisition, Symantec refocused its strategy and established more aggressive fiscal year 2017 and long-term performance goals. As such, the Compensation Committee approved revised goals in December 2016 that reflected the integrated business objectives… The non-GAAP revenue and operating income targets and payout curves for the FY17 Executive Annual Incentive Plans were revised in December 2016 to reflect the impact of the Blue Coat acquisition on our financial plan.

174.    LifeLock was acquired in February 2017, after the Compensation Committee set the incentive compensation metrics in December 2016.  While the proxy claims that, "[t]he targets for and achievement of non-GAAP operating income and revenue were normalized to exclude the financial impact of the LifeLock acquisition as it was not completed until near the end of our fiscal year (February 2017)," the income targets and payout curves were not changed to account for the LifeLock acquisition, only for the Blue Coat deal:

> Non-GAAP operating income and non-GAAP revenue performance targets were established based on a range of inputs at first without giving effect to the then-proposed acquisition of Blue Coat, including external market economic conditions, growth outlooks for our product portfolio, the competitive environment, our internal budgets and market expectations. The non-GAAP revenue and operating income targets and payout curves for the FY17 Executive Annual Incentive Plans were revised in December 2016 to reflect the impact of the Blue Coat acquisition on our financial plan. As presented in the tables below, for fiscal 2017, our non-GAAP operating income target was $1,143 million and our non-GAAP revenue target was $4,040 million. The non-GAAP operating income and non-GAAP revenue targets prior to the revision were $985 million and $3,550 million

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

175.     As a result, the impact of LifeLock revenues should have been excluded from the fiscal 2017 non-GAAP revenue and non-GAAP operating income figures used for the AIP.

176.     According to the Company's 2017 Form 10-K, the impact of LifeLock was as follows:

> Our results of continuing operations for fiscal 2017 include $72 million and $98 million, respectively, of net revenues and a pre-tax loss attributable to LifeLock beginning February 9, 2017…. Transaction costs of $21 million incurred by Symantec in connection with the LifeLock acquisition are included in operating expenses in our Consolidated Statements of Operations for fiscal 2017.

177.     The Form 10-K additionally disclosed that, "[d]ue to the fair value adjustment of deferred revenue as a result of the accounting for the LifeLock acquisition, we excluded revenue of $28 million in the post-acquisition period."  Therefore, fiscal 2017 non-GAAP LifeLock revenue was $100 million, comprised of $72 million GAAP revenue and a non-GAAP adjustment of $28 million.

178.     The $100 million non-GAAP LifeLock revenue was not excluded from the non-GAAP revenue figure used to calculate AIP achievement: the reported non-GAAP revenue figure was $4,163, including LifeLock, and the "actual" non-GAAP figure used for the AIP was $4,086, less than $100 million less than the reported figure.

179.     As acknowledged in the proxy statement, the $100 million non-GAAP LifeLock revenue should have been deducted from the reported $4,163 million of non-GAAP revenue for the purposes of evaluating achievement of incentive compensation targets because the targets were set prior to the acquisition and Symantec's executives were not responsible for the LifeLock revenue, among other reasons.  Accordingly, the correct starting point for the "actual" non-GAAP revenue incentive compensation target was $4,063 million, *not* $4,163 million.  Even assuming that no other improperly classified transition costs were included, which discovery will demonstrate that they were, after applying the $77 million downward adjustment used by the Compensation Committee to the correct starting point number of $4,063 million, the non-GAAP revenue number used for the AIP should have been $3,986, below the $4,040 million threshold, resulting in zero funding.

180.     The non-GAAP revenue number used for the AIPs was also artificially inflated for other reasons including: (i) the $116 million of deferred revenue non-GAAP adjustments for Blue

Coat were above the anticipated $103 million or less, were therefore not anticipated by the Compensation Committee when the targets were set, and should have further reduced the "actual" revenue number used for the AIP an additional $13 million; and (ii) as set forth herein, at the time the proxy statement was issued the Board and the Company's executives knew that transition costs were being inflated to increase incentive compensation attainment, which further reduced the true non-GAAP revenue number an additional amount to be determined in discovery.

181.    The non-GAAP operating income result used for the AIP was also wrongfully inflated.  The Company report non-GAAP operating income of $1,194 million in May 2017.  The "actual" number used for the AIP, shown above, reflects an upward adjustment of $3 million, the basis for which was not disclosed, to reach funding under that metric of 125%.  The proxy statement discloses that Symantec's non-GAAP operating income is defined as:

> GAAP gross profit less operating expenses, adjusted to exclude stock-based compensation expense, charges related to the amortization of intangible assets, restructuring, separation, transition and other related expenses, acquisition and integration expenses, the impact from inventory fair value adjustments as part of business combination accounting entries and certain other income and expense items that management considers unrelated to Symantec's core operations including non-GAAP revenue adjustments.

182.    The non-GAAP operating income figure used for the AIP should have been *lower* than the result reported in May 2017 because that result reflected income attributable to LifeLock, inflated transition costs, Blue Coat deferred revenue, in addition to other improperly included transition costs to be quantified in discovery.  However, the number used was $3 million above the reported figure.  As set forth above, the improperly included LifeLock and Blue Coat revenues alone exceeded $53 million, and had they been excluded from AIP results the  payment under the AIP should have been zero for the operating income metric.

183.    Supporting an inference of bad faith, the 2017 proxy disclosed that:

> The Compensation Committee originally established a target for non-GAAP operating income margin in fiscal 2017 under the fiscal 2017 PRU grants. In evaluating the financial impact of the Blue Coat acquisition, the LifeLock acquisition, as well as the new financial plans for the combined company for fiscal 2018, our Compensation Committee changed the metric under the fiscal 2017 PRU grants from non-GAAP operating income margin to non-GAAP operating income, and established a non-GAAP operating income target for the subsequent fiscal year measurement period, fiscal 2018. For purposes of calculating performance under the

AMENDED COMPLAINT

PRUs, we define non-GAAP operating income as our fiscal 2018 non-GAAP operating income reported as part of our earnings release…

184.     The decision to measure PRU grants on the subsequent year's results departed from the Company's past practice.  According to the proxy statements filed by Symantec in 2014, 2015, and 2016, "our executive officers our executive officers were eligible to receive shares… based upon (i) our achievement of annual non-GAAP [metric] for the first fiscal year covered by the award…."  That is, for example, the 2016 award is based on the achievement of the annual metric for 2016, the 2015 award is based on achievement of the annual metric for 2015, and so on.

185.     Additionally supporting an inference of bad faith, the ratios of the relative subjective "restructuring, separation, transition and other" non-GAAP adjustments to non-GAAP revenue and non-GAAP operating expenses were each 4% in 2016.  During 2017 those ratios increased to 7%.  Plaintiff infers that the significant increase in this ratio was due to manipulation to attain incentive compensation targets.

186.     Likewise, due to the incentives created by the decision to change the fiscal year evaluated for PRU targets, these ratios continued to increase during 2018 to approximately 8% - 9%.  Indeed, in the fourth quarter of 2018, the ratio reached 11%, nearly triple the pre-acquisition amount.

187.     Supporting that improper manipulation occurred is that Symantec's 2017 Form 10-K stated that the Company expected to incur "approximately $240 million to $290 million" in connection with the Company's restructuring plan.  However, the 2018 "restructuring, separation, transition, and other" non-GAAP adjustment was $417 million.

188.     Finally, during 2017, the target metric for PRUs was non-GAAP operating margin.  The specific threshold to achieve payout of the PRUs was not disclosed.  As demonstrated by the documents produced pursuant to Plaintiff's books and records demand, in August 2016, the internally forecasted margin was above 28%.  Plaintiff infers that the threshold set by the Compensation Committee was not less than 27%, the midpoint of the outlook provided to the public at the time.  If, in full year 2017, the ratio of "restructuring, separation, transition, & other" non-GAAP adjustment to non-GAAP revenue had maintained the 4% "normal" level of 2016, the

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                                    49

Company's non-GAAP operating margin would have been approximately 25.9%, insufficient to meet the target.

189.    Thus, the Company's 2017 proxy statement demonstrates that in 2017: (i) that the Board's process for setting incentive compensation targets departed sharply from past practice; (ii) with respect to award of the PRUs, the Board belatedly changed the financial metrics used as targets in ways that increased the payouts to the Officer Defendants; and (iii) the Board decided to change the year during which the results were to be achieved such that 2017 incentive compensation would be evaluated against 2018 results.

190.    Due to the change in PRU metric, the full year 2018 non-GAAP operating income became relevant to 2017 PRU eligibility creating an incentive to manipulate the 2018 non-GAAP adjustments in order to become eligible for the 2017 PRUs.

191.    The 2017 proxy statement solicited shareholder approval of an amendment to the 2013 Equity Incentive Plan to increase the number of shares of common stock reserved for issuance thereunder by 8 million shares.  If approved, the total number of shares reserved for issuance would be 70 million shares, which represented 11.3% of the Company's outstanding as of July 19, 2017.

192.    The 2017 proxy statement was materially misleading for the following reasons: a) it concealed that the non-GAAP revenue and operating income metrics used to award executive incentive compensation had not actually been achieved and had been artificially inflated by improper adjustments; and b) had the appropriate adjustments been applied, the funding for incentive awards under the non-GAAP revenue and operating income metrics would have been zero, as opposed to 100% and 125%, respectively.

193.    At some time during Symantec's fiscal second quarter of 2018, the period from July 1, 2017 to September 29, 2017, the Director Defendants engaged an outside advisor, the accounting firm Ernst & Young LLP ("EY"), to enhance the Company's reported non-GAAP measures.  The Director Defendants concealed this retention in the proxy statement filed on August 16, 2017 and continued to conceal the retention through the shareholder vote on October 5, 2017.  The concealment of this outside advisor, which the books and records production demonstrates was

tasked with addressing inaccuracies in the Company's non-GAAP measures, is an independent reason that the 2017 proxy statement was materially misleading.

194.    On October 6, 2017, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2017 proxy statement.  In particular, the amendments to the Company's 2013 Equity Incentive Plan were approved.  The misleading disclosures and concealment of artificially inflated incentive compensation in the proxy statement were fundamental to the shareholder approval of the amendments to the 2013 Equity Incentive Plan. As a result of the misleading statements and omissions, the Company was harmed by the issuance of stock for incentive compensation when the Company's financial performance was being artificially and improperly inflated.

**F.    Defendants Breached Their Fiduciary Duties by Insider Stock Sales at Inflated Prices and Received Excessive Executive Compensation**

**1.    Clark, Noviello, Garfield, Sands, and Vautrinot Sold Over $20 Million in Symantec Stock While in Possession of Material Non-Public Information**

<u>Noviello</u>

195.    Defendant Noviello is the Company's Chief Financial Officer with a highly sophisticated understanding of the Company's results and their import.

196.    As set forth herein, as early as August 2016, defendant Noviello possessed material negative information which he knew was being concealed from investors.  Defendant Noviello consciously acted to exploit his knowledge by selling over $12.89 million of Symantec stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/15/2017 | 27,741 | $32.45 | $900,154 |
| 7/12/2017 | 10,034 | $30.00 | $301,020 |
| 8/28/2017 | 14,925 | $30.00 | $447,750 |
| 9/7/2017 | 7,688 | $30.00 | $230,640 |
| 11/6/2017 | 375,000 | $29.38 | $11,018,400 |
| | 435,388 | | $12,897,964 |

197.    Defendant Noviello thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Clark

198.   Defendant Clark is the Company's Chief Executive Officer with a highly sophisticated understanding of the Company's results and their import.

199.   As set forth herein, as early as August 2016, defendant Clark possessed material negative information which he knew was being concealed from investors. Defendant Clark consciously acted to exploit his knowledge by selling 200,000 shares of Symantec stock between August 28 and 31, 2017 at $30.00 for a combined benefit of approximately $6 million.

200.   Defendant Clark thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Garfield

201.   Defendant Garfield was the Company's Chief Accounting Officer with a highly sophisticated understanding of the Company's results and their import.

202.   As set forth herein, as early as August 2016, defendant Garfield possessed material negative information which he knew was being concealed from investors. Defendant Garfield consciously acted to exploit his knowledge by selling 29,466 shares of Symantec stock between May 23 and June 2, 2017 at prices between $29.39 and $30.06 for a combined benefit of $873,657.

203.   Defendant Garfield thus used his fiduciary position to enrich himself and failed to discharge his fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

Sands and Vautrinot

204.   Defendants Sands and Vautrinot serve as directors of the Company and members of the Audit Committee.

205.   As set forth herein, as early as August 2016, defendants Sands and Vautrinot possessed material negative information which they knew was being concealed from investors.

206.   Defendant Sands consciously acted to exploit her knowledge by selling $247,816 worth of Symantec stock to her substantial benefit as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

| | | | |
|---|---|---|---|
| 7/12/2017 | 2,000 | $30.00 | $60,000 |
| 7/17/2017 | 2,000 | $30.40 | $60,000 |
| 8/28/2017 | 2,000 | $30.00 | $60,000 |
| 9/18/2017 | 2,000 | $33.51 | $67,016 |
| | 8,000 | | **$247,816** |

207.     Defendant Vautrinot consciously acted to exploit her knowledge by selling $247,816 worth of Symantec stock to her substantial benefit as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/3/2017 | 2,500 | $28.45 | $71,125 |
| 10/2/2017 | 2,500 | $32.81 | $82,025 |
| 3/9/2018 | 4,000 | $27.72 | $110,880 |
| | 9,000 | | **$264,030** |

208.     Defendants Sands and Vautrinot thus used their fiduciary position to enrich themselves and failed to discharge their fiduciary duties by causing the Company to candidly reveal the truth of its business condition.

### 2. Defendants Clark and Noviello Received Substantial Incentive Compensation Based on Artificially Inflated Non-GAAP Measures

209.     The 2017 proxy statement described the Company's Executive Annual Incentive Plan. Management proposes, and the Compensation Committee approves, performance targets typically within the first 90 days of each plan year.  However, after the Blue Coat acquisition, "the Compensation Committee approved revised goals in December 2016 that reflected the integrated business objectives, while also reducing the potential upside in the plan relative to prior years (to 150% of target from 200%) given the relatively short period of time for performance to be delivered."

210.     According to the proxy statement, defendants Clark and Noviello received compensation based on the Company's performance measured by 2017 non-GAAP operating income (target level of $1.143 billion) and 2017 non-GAAP revenue (target range of $4.04 to $4.12 billion).  If the non-GAAP metrics were below the target levels, then the executives were not awarded any incentive award compensation. Moreover:

a)     For non-GAAP operating income: (a) at the threshold achievement level of 95.4% of target, the funding level is 50%; (b) above the threshold achievement level, the funding level increases incrementally, up to a funding level of 100% at a target achievement level of 100%;

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

(c) above the target achievement level, funding increases incrementally, up to a cap of a 150%

funding based on a maximum achievement level of at least 109.1% of target.

b)     For non-GAAP revenue, the Compensation Committee established a target

achievement range of $4.04 billion to $4.12 billion, where: (a) the funding level is 100% for the

achievement of the levels between this range; (b) below the threshold achievement level of $4.04

billion, the funding level is 0%; and (c) above the $4.12 billion achievement level, funding increases

incrementally, up to a cap of a 150% funding based on a maximum achievement level of at $4.162

billion. The targets for and achievement of non-GAAP operating income and revenue were

normalized to exclude the financial impact of the LifeLock acquisition as it was not completed until

near the end of our fiscal year (February 2017).

211.   For fiscal year 2017, which ended March 31, 2017, the Compensation Committee

represented that the Company achieved $1.197 billion non-GAAP operating income (i.e., 104.7%

of target, resulting in 125.8% funding) and $4.086 billion non-GAAP revenue (i.e., 100% of target,

resulting in 100% funding).   As a result, the Compensation Committee approved a payout of 111.5%

for fiscal 2017, and Defendant Clark received $743,333 and Defendant Noviello received $479,673

in bonus cash compensation.

212.   The improper classification of certain expenses as "transition costs" was crucial to

defendants' executive compensation.  The difference between the reported non-GAAP operating

income and the threshold to receive any bonus compensation is $107 million.  Notably, "transition

costs" for fiscal year 2017 was $94 million, or 87.9% of the $107 million difference necessary to

receive bonus compensation.

213.   Defendant Garfield testified in the Securities Class Action that the executive

incentive compensation plan "incentivized people to increase non-GAAP operating income either

through more revenue or less expenses" and that "people would request if an expense they had

qualified to be excluded from non-GAAP operating income." Securities Class Action, Dkt. 325, Ex.

25. He confirmed that "cutting expenses was a way to get more money for the executives." *Id.*

214.   The Officer Defendants were also motivated to misreport revenue to increase their

incentive compensation. For example, Defendant Clark promised future functionality to Oracle days

1   before the close of the fourth quarter 2018, allowing Symantec to improperly recognize $12 million

2   in revenue during fiscal 2018. Shortly thereafter, defendant Clark was asked "Think we did well

3   enough to hit more than 2.5 vcp[?]" Securities Class Action, Dkt. 336, Ex. 99. (VCP refers to Value

4   Creation Plan, which was another name for the 2017 PRU plan.)

5       215.    The Board was on notice as early as August 7, 2017 of this manipulation. During his

6   exit interview with defendant Sands, defendant Garfield explained that Symantec "created a

7   compensation plan that drives people to do something that's wrong. . . because they are coming up

8   with this definition of transitionary [sic]." Securities Class Action, Dkt. 337, Ex. 105. As a result,

9   management is "driving the Non-GAAP number up" because "[a] couple hundred million of extra

10  Non-GAAP dollars for Fiscal 18 drives the VCP" such that the Officer Defendants "can triple their

11  income." *Id.* Defendant Sands specifically clarified this point, and defendant Garfield explained

12  that, because management is measured against Non-GAAP numbers, they are incentivized to

13  remove expenses to increase Non-GAAP operating income. *Id.* He confirmed: "There's stuff that is

14  going into GAAP-only that shouldn't be there." *Id.*

15      216.    Defendant Garfield explained these notes during his deposition in the Securities

16  Class Action. He stated: "Well, if you create a budget and you legitimately, you know, perform

17  under that budget, yeah, so that would be executives within the company who had setting it and

18  trying to increase that number and increasing their own personal income." Securities Class Action,

19  Dkt. 325, Ex. 25. He confirmed that defendant Clark "was a participant." *Id.* Similarly, in an email

20  between accounting personnel, which was later conveyed to defendants Clark and Noviello,

21  management found that "[t]o the extent, we don't hit our revenue numbers, we will need to take out

22  more cost or the overall company will not hit our numbers for bonus, VCP, etc." Securities Class

23  Action, Dkt. 339, Ex. 107.

24      217.    In addition to cash incentives, Defendants Clark and Noviello also received equity

25  incentive awards under their fiscal year 2017 executive compensation plan, including Performance-

26  based Restricted Stock Units ("PRUs"). The 2017 proxy statement stated that metrics for 2017 PRU

27  grants were adjusted after the Blue Coat and LifeLock acquisitions:

28

AMENDED COMPLAINT

The Compensation Committee originally established a target for non-GAAP operating income margin in fiscal 2017 under the fiscal 2017 PRU grants. In evaluating the financial impact of the Blue Coat acquisition, the LifeLock acquisition, as well as the new financial plans for the combined company for fiscal 2018, *our Compensation Committee changed the metric under the fiscal 2017 PRU grants from non-GAAP operating income margin to non-GAAP operating income, and established a non-GAAP operating income target for the subsequent fiscal year measurement period, fiscal 2018.* For purposes of calculating performance under the PRUs, *we define non-GAAP operating income as our fiscal 2018 non-GAAP operating income reported as part of our earnings release, as adjusted for any positive or negative foreign exchange impacts (subject to cap on negative impacts to revenue of up to $91 million),* plus the aggregate pre-tax dollar value of the benefit to non-GAAP EPS in the period from any capital structure changes, such as cash interest expense savings due to prepayment of indebtedness. *We have not disclosed the specific target for non-GAAP operating income for fiscal 2018 as that internal target is highly confidential and not reported publicly.* Disclosing the specific non-GAAP operating income target would provide competitors and third parties with insights into the Company's internal planning processes which might allow our competitors to predict certain business strategies and cause us competitive harm.

218.    According to the Company's Form 10-K for fiscal 2018, the non-GAAP operating income target for fiscal 2017 PRUs was $1.56 billion.  The 10-K further stated that the Company achieved $1.705 billion in adjusted non-GAAP operating income, or $109.29% of target level.  As a result, executives would receive 268.2% of target payout, of which 250% would be earned and vested at the end of fiscal 2018.  The remaining 18.2% is eligible to be earned at the end of fiscal 2019, provided the executive is employed by Symantec through the end of fiscal 2019.

219.    Thus, as set forth in the table below, defendant Clark received a total of over **$41.5 million** in Symantec stock at the end of fiscal year 2018 and is eligible to receive an additional $3 million in Symantec shares at the end of fiscal year 2019 under the FY 2017 PRUs plan.  Defendant Noviello received nearly $10.5 million in Symantec stock at the end of fiscal year 2018 and is poised to receive $764,398 in additional Symantec stock at the end of fiscal year 2019.

| Executive | PRU Target # | Target PRU Value at Grant Date | Eligible & Earned PRUs at End of Fiscal 2018 | Actual Value of PRUs at End of Fiscal 2018 | Remaining PRUs to be Received at End of Fiscal 2019 | Value of Remaining PRUs To Be Received At End Of Fiscal 2019 |
|---|---|---|---|---|---|---|
| Clark | 961,670 | $16,636,891 | 2,404,175 | $41,592,228 | 175,024 | $3,027,914 |
| Noviello | 242,774 | $4,199,990 | 606,935 | $10,499,975 | 44,185 | $764,383 |

220.    Moreover, for fiscal 2018, the Compensation Committee determined that PRUs would be awarded based on the Company's 2018 non-GAAP EPS, with a target of $1.64 per share.

The Compensation Committee determined that the Company achieved non-GAAP EPS of $1.56 per share, or 95.2% of target, resulting in 25.25% of the total fiscal 2018 PRUs becoming eligible to be earned at the end of the fiscal year 2018 PRU Performance Period at the end of fiscal 2020.

221.    Thus, as set forth in the table below, due to Defendants' manipulation of the Company's non-GAAP EPS, Defendant Clark is eligible to receive 85,768 Symantec shares with a value at grant date (June 9, 2017) of nearly $3 million at the end of fiscal year 2020.  Similarly, Defendant Noviello is eligible to receive over 40,000 Symantec shares with a value at grant date of over $1.3 million at the end of fiscal year 2020.

**FY 2018 PRU Plan**

| Executive | PRU Target # in Year One | Target PRU Year One Value at Grant Date | PRUs Eligible To Be Earned at end of fiscal 2020 | Actual Value of PRUs Eligible To Be Earned At End Of Fiscal 2020 |
|---|---|---|---|---|
| Clark | 169,837 | $5,828,806 | 85,768 | $2,943,547 |
| Noviello | 79,257 | $2,720,100 | 40,025 | $1,373,651 |

## VI.    DAMAGES TO SYMANTEC

222.    As a direct and proximate result of Defendants' actions, Symantec has been seriously harmed and will continue to be. Such harm includes, but is but not limited to:

(a) Legal fees incurred in connection with the Securities Class Action;

(b) The $70 million settlement of the Securities Class Action;

(c) Costs incurred in connection with the four-year SEC investigation into the Company's accounting practices;

(d) Costs incurred by issuing 8 million shares to the Equity Incentive Compensation Plan due to the shareholder vote obtained by representations in the misleading proxy statement**;**

(e) Excessive compensation paid to Officer Defendants due to artificially inflated non-GAAP measures;

(f) Ill-gotten gains obtained by Defendants due to insider trading; and

(g) Excessive compensation and benefits paid to the defendants who have breached their duties to Symantec.

223.     In addition, Symantec's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its misleading statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

224.     The actions complained of herein have irreparably damaged Symantec's corporate image and goodwill.  For at least the foreseeable future, Symantec will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Symantec's ability to raise equity capital or debt on favorable terms in the future is now impaired

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

225.     Plaintiff brings this action derivatively in the right and for the benefit of Symantec to redress injuries suffered by Symantec as a direct result of the wrongdoing alleged herein. Symantec is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

226.     Plaintiff will adequately and fairly represent the interests of Symantec in enforcing and prosecuting its rights.

227.     Plaintiff was a stockholder of Symantec at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Symantec stockholder.

228.     When this action was commenced, Symantec's Board of Directors consisted of thirteen directors: defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, Vautrinot and non-party directors Sue Barsamian, Peter A. Feld, Dale L. Fuller, and Richard S. Hill.  Plaintiff did not make a demand on the Board to institute this action because there is reason to doubt that nine of the thirteen current members of the Board could disinterestedly respond to a demand.  The facts detailed herein demonstrate that the nine Director Defendants currently on the Board face a substantial likelihood of liability because they: (i) affirmatively adopted, implemented, and condoned the issuance of artificially inflated non-GAAP financial results, which is not a legally protected business decision and was not a valid exercise of business judgment; (ii) knew the Company's disclosed non-GAAP measures were inflated and permitted the payment of millions of

1  dollars in incentive compensation on their basis; (iii) consciously disregarded numerous red flags of

2  misconduct throughout the relevant period, subjecting them to a substantial likelihood of liability as

3  to Plaintiff's claims against them in this action; and (iv) issued a materially misleading proxy

4  statement falsely representing that incentive compensation targets had been achieved when they had

5  not, in order to obtain shareholder approval of the issuance of millions of new Symantec shares for

6  the incentive compensation of the same officers who wrongfully received incentive compensation

7  in 2017.

8  **Defendant Clark**

9  229.    At all relevant times, Clark was the Company's CEO and President. Clark personally

10  pressured employees to engage in aggressive accounting practices to overstate revenue and

11  operating income metrics that would increase his compensation.  Clark was presented with evidence

12  of the alleged misconduct at Board meetings, so he had personal knowledge of the inaccuracy of the

13  Company's financial metrics.  As a result, Clark would be interested in a demand regarding his own

14  wrongdoing and demand is futile as to him.

15  230.    Defendant Clark received many millions of dollars in excessive incentive

16  compensation due to manipulation of non-GAAP financial measures that participated in and

17  concealed.  As a result, Clark would be interested in a demand regarding his receipt of improper

18  incentive compensation and demand is excused on that basis.

19  231.    Defendant Clark is not disinterested because he is primarily employed as the CEO

20  and President of Symantec.  He is an employee of the Company, earning more than $23 million in

21  compensation over two fiscal years, according to the 2018 proxy statement.  Moreover, Clark is not

22  an independent director under the listing standards of the NASDAQ exchange or as defined by the

23  Company.  As a result, demand is excused as to Clark on this basis as well.

24  **Defendant Dangeard**

25  232.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December

26  20, 2017, defendant Dangeard was present for twelve Audit Committee meetings and four full Board

27  meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments.

28  The documents produced in response to plaintiff's books and records demand demonstrate that

AMENDED COMPLAINT

Dangeard received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Dangeard knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.  Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Dangeard and his fellow directors.  Dangeard understood the importance of the Company's non-GAAP adjustments both to the investing public and in calculating and paying executive incentive compensation.

233.   Due to his attendance at these Audit Committee and Board meetings, Dangeard knew of the importance of ensuring internal control over revenue recognition in the Blue Coat business due to the significant change in revenue recognition and considered the difficulties of reconciling total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance. Defendant Dangeard participated in discussions regarding excessive transition expenses, questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment of deferred revenue from Blue Coat.  Dangeard was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

234.   Dangeard participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Dangeard knew of the impact of the Company's non-GAAP results on incentive compensation.  Dangeard knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Dangeard therefore knew of evidence that the Company's internal controls were inadequate.

235.   Defendant Dangeard knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

236.   As alleged herein, defendant Dangeard, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

237.   As a result, Dangeard knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of his fiduciary duties.  As a result, demand is excused as to defendant Dangeard regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Hao**

238.   As set forth herein and in Exhibit A hereto, between August 1, 2016 and December 20, 2017, defendant Hao was present for six Audit Committee meetings and five full Board meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments.  The documents produced in response to plaintiff's books and records demand demonstrate that Hao received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Hao knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.  Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Hao and his fellow directors.  Hao understood the importance of the Company's non-GAAP adjustments both to the investing public and in calculating and paying executive incentive compensation.

239.   Due to his attendance at these Audit Committee and Board meetings, Hao knew of the importance of ensuring internal control over revenue recognition in the Blue Coat business due to the significant change in revenue recognition and considered the difficulties of reconciling total

impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance. Defendant Hao participated in discussions regarding excessive transition expenses, questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat revenue recognition guidance.  Hao was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

240.    Hao participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Hao knew of the impact of the Company's non-GAAP results on incentive compensation.  Hao knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Hao therefore knew of evidence that the Company's internal controls were inadequate.

241.    Defendant Hao knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

242.    As alleged herein, defendant Hao, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

243.    As a result, Hao knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of his fiduciary duties.  As a result, demand is excused as to defendant Hao regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

1   **Defendant Humphrey**

2       244.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December

3   20, 2017, defendant Humphrey was present for nine Audit Committee meetings and five full Board

4   meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments.

5   The documents produced in response to plaintiff's books and records demand demonstrate that

6   Humphrey received regular reports from management regarding Symantec's non-GAAP

7   adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how

8   Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP

9   adjustments on executive incentive compensation.   As alleged herein, Humphrey knew that the

10  accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's

11  financial results.  Those non-GAAP adjustments were in fact regularly considered and discussed by

12  defendant Humphrey and his fellow directors.   Humphrey understood the importance of the

13  Company's non-GAAP adjustments both to the investing public and in calculating and paying

14  executive incentive compensation.

15      245.    Due to his attendance at these Audit Committee and Board meetings, Humphrey

16  knew of the importance of ensuring internal control over revenue recognition in the Blue Coat

17  business due to the significant change in revenue recognition and considered the difficulties of

18  reconciling total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue

19  guidance.  Defendant Humphrey participated in discussions regarding excessive transition expenses,

20  questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and

21  the treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat

22  revenue recognition guidance.  Humphrey was regularly updated on Blue Coat acquisition activities

23  and the integration of Life Lock into Symantec.

24      246.    Humphrey participated in setting incentive compensation targets and exercised

25  discretion to approve adjustments to non-GAAP results specifically for the purpose of executive

26  incentive compensation.  Humphrey knew of the impact of the Company's non-GAAP results on

27  incentive compensation.   Humphrey knew of numerous significant deficiencies related to

28  Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.

AMENDED COMPLAINT

Defendant Humphrey therefore knew of evidence that the Company's internal controls were inadequate.

247.   Defendant Humphrey knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

248.   As alleged herein, defendant Humphrey, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

249.   As a result, Humphrey knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of his fiduciary duties.  As a result, demand is excused as to defendant Humphrey regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Mahoney**

250.   As set forth herein and in Exhibit A hereto, between August 1, 2016 and December 20, 2017, defendant Mahoney was present for six Audit Committee meetings and five full Board meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments. The documents produced in response to plaintiff's books and records demand demonstrate that Mahoney received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Mahoney knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.

1   Those non-GAAP adjustments were in fact regularly considered and discussed by defendant

2   Mahoney and his fellow directors.  Mahoney understood the importance of the Company's non-

3   GAAP adjustments both to the investing public and in calculating and paying executive incentive

4   compensation.

5          251.    Due to his attendance at these Audit Committee and Board meetings, Mahoney knew

6   of the importance of ensuring internal control over revenue recognition in the Blue Coat business

7   due to the significant change in revenue recognition and considered the difficulties of reconciling

8   total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance.

9   Defendant Mahoney participated in discussions regarding excessive transition expenses, questions

10  from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the

11  treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat

12  revenue recognition guidance.  Mahoney was regularly updated on Blue Coat acquisition activities

13  and the integration of Life Lock into Symantec.

14         252.    Mahoney participated in setting incentive compensation targets and exercised

15  discretion to approve adjustments to non-GAAP results specifically for the purpose of executive

16  incentive compensation.  Mahoney knew of the impact of the Company's non-GAAP results on

17  incentive compensation. Mahoney knew of numerous significant deficiencies related to Symantec's

18  2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Mahoney

19  therefore knew of evidence that the Company's internal controls were inadequate.

20         253.    Defendant Mahoney knew that EY had been retained to evaluate problems with

21  Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's

22  controls over those disclosures, and knew that both of the foregoing were concealed from the

23  Company's shareholders.

24         254.    As alleged herein, defendant Mahoney, knew or should have known that there was a

25  deferred revenue write down in purchase accounting that would be recognized over time, rather than

26  upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject

27  to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and

28

1    that executives were incentivized to manipulate non-GAAP measures which impacted their bonus

2    compensation.

3        255.    As a result, Mahoney knew the Company's disclosures were not truthful, consciously

4    allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive

5    compensation based upon the erroneous results. These acts were not in good faith and were breaches

6    of his fiduciary duties. As a result, demand is excused as to defendant Mahoney regarding his

7    wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

8    **Defendant Sands**

9        256.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December

10    20, 2017, defendant Sands was present for eleven Audit Committee meetings and five full Board

11    meetings during which she discussed, considered, or reviewed Symantec's non-GAAP adjustments.

12    The documents produced in response to plaintiff's books and records demand demonstrate that

13    Sands received regular reports from management regarding Symantec's non-GAAP adjustments,

14    monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's

15    non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments

16    on executive incentive compensation. As alleged herein, Sands knew that the accuracy, amount,

17    and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.

18    Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Sands

19    and his fellow directors. Sands understood the importance of the Company's non-GAAP

20    adjustments both to the investing public and in calculating and paying executive incentive

21    compensation.

22        257.    Due to her attendance at these Audit Committee and Board meetings, Sands knew of

23    the importance of ensuring internal control over revenue recognition in the Blue Coat business due

24    to the significant change in revenue recognition and considered the difficulties of reconciling total

25    impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance.

26    Defendant Sands participated in discussions regarding excessive transition expenses, questions from

27    the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment

28    of deferred revenue from Blue Coat. was aware of difficulties reconciling Blue Coat revenue

recognition guidance.  Sands was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

258.    Sands participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Sands knew of the impact of the Company's non-GAAP results on incentive compensation.  Sands knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Sands therefore knew of evidence that the Company's internal controls were inadequate.

259.    Defendant Sands knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

260.    As alleged herein, defendant Sands, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

261.    As a result, Sands knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of her fiduciary duties.  As a result, demand is excused as to defendant Sands regarding his wrongdoing and the wrongdoing of the Officer Defendants, which she consciously permitted.

**Defendant Schulman**

262.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December 20, 2017, defendant Schulman was present for six Audit Committee meetings and five full Board meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments. The documents produced in response to plaintiff's books and records demand demonstrate that

Schulman received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Schulman knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.  Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Schulman and his fellow directors.  Schulman understood the importance of the Company's non-GAAP adjustments both to the investing public and in calculating and paying executive incentive compensation.

263.    Due to his attendance at these Audit Committee and Board meetings, Schulman knew of the importance of ensuring internal control over revenue recognition in the Blue Coat business due to the significant change in revenue recognition and considered the difficulties of reconciling total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance. Defendant Schulman participated in discussions regarding excessive transition expenses, questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat revenue recognition guidance.  Schulman was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

264.    Schulman participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Schulman knew of the impact of the Company's non-GAAP results on incentive compensation.   Schulman knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows. Defendant Schulman therefore knew of evidence that the Company's internal controls were inadequate.

265.    Defendant Schulman knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's

controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

266.    As alleged herein, defendant Schulman, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

267.    As a result, Schulman knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of his fiduciary duties.  As a result, demand is excused as to defendant Schulman regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Unruh**

268.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December 20, 2017, defendant Unruh was present for twelve Audit Committee meetings and five full Board meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments. The documents produced in response to plaintiff's books and records demand demonstrate that Unruh received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Unruh knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results. Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Unruh and his fellow directors.   Unruh understood the importance of the Company's non-GAAP adjustments  both  to  the  investing  public  and  in  calculating  and  paying  executive  incentive compensation.

269.     Due to his attendance at these Audit Committee and Board meetings, Unruh knew of the importance of ensuring internal control over revenue recognition in the Blue Coat business due to the significant change in revenue recognition and considered the difficulties of reconciling total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance. Defendant Unruh participated in discussions regarding excessive transition expenses, questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat revenue recognition guidance.  Unruh was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

270.     Unruh participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Unruh knew of the impact of the Company's non-GAAP results on incentive compensation.  Unruh knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Unruh therefore knew of evidence that the Company's internal controls were inadequate.

271.     Defendant Unruh knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

272.     As alleged herein, defendant Unruh, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

273.     As a result, Unruh knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches

of his fiduciary duties.  As a result, demand is excused as to defendant Unruh regarding his wrongdoing and the wrongdoing of the Officer Defendants, which he consciously permitted.

**Defendant Vautrinot**

274.    As set forth herein and in Exhibit A hereto, between August 1, 2016 and December 20, 2017, defendant Vautrinot was present for twelve Audit Committee meetings and four full Board meetings during which he discussed, considered, or reviewed Symantec's non-GAAP adjustments. The documents produced in response to plaintiff's books and records demand demonstrate that Vautrinot received regular reports from management regarding Symantec's non-GAAP adjustments, monitored whether Symantec was achieving its non-GAAP guidance, understood how Symantec's non-GAAP results were trending, and was informed as to the impact of the non-GAAP adjustments on executive incentive compensation.  As alleged herein, Vautrinot knew that the accuracy, amount, and basis for Symantec's non-GAAP adjustments were critical to the Company's financial results.  Those non-GAAP adjustments were in fact regularly considered and discussed by defendant Vautrinot and his fellow directors.  Vautrinot understood the importance of the Company's non-GAAP adjustments both to the investing public and in calculating and paying executive incentive compensation.

275.    Due to her attendance at these Audit Committee and Board meetings, Vautrinot knew of the importance of ensuring internal control over revenue recognition in the Blue Coat business due to the significant change in revenue recognition and considered the difficulties of reconciling total impact of Blue Coat revenue and non-GAAP revenue guidance to GAAP revenue guidance. Defendant Vautrinot participated in discussions regarding excessive transition expenses, questions from the SEC regarding accounting for sales and revenue, Blue Coat integration risks, and the treatment of deferred revenue from Blue Coat.  was aware of difficulties reconciling Blue Coat revenue recognition guidance.  Vautrinot was regularly updated on Blue Coat acquisition activities and the integration of Life Lock into Symantec.

276.    Vautrinot participated in setting incentive compensation targets and exercised discretion to approve adjustments to non-GAAP results specifically for the purpose of executive incentive compensation.  Vautrinot knew of the impact of the Company's non-GAAP results on

incentive compensation.  Vautrinot knew of numerous significant deficiencies related to Symantec's 2017 Form 10-K, related to restructuring charges and statements of cash flows.  Defendant Vautrinot therefore knew of evidence that the Company's internal controls were inadequate.

277.    Defendant Vautrinot knew that EY had been retained to evaluate problems with Symantec's non-GAAP financial disclosures, knew that there were weaknesses in the Company's controls over those disclosures, and knew that both of the foregoing were concealed from the Company's shareholders.

278.    As alleged herein, defendant Vautrinot, knew or should have known that there was a deferred revenue write down in purchase accounting that would be recognized over time, rather than upfront; that transition costs impacted non-GAAP measures; that non-GAAP measures were subject to discretion; that the Board reserved the right to approve adjustments to non-GAAP metrics; and that executives were incentivized to manipulate non-GAAP measures which impacted their bonus compensation.

279.    As a result, Vautrinot knew the Company's disclosures were not truthful, consciously allowed continued untruthful disclosures, and consciously allowed the payment of inflated incentive compensation based upon the erroneous results.  These acts were not in good faith and were breaches of his fiduciary duties.  As a result, demand is excused as to defendant Vautrinot regarding her wrongdoing and the wrongdoing of the Officer Defendants, which she consciously permitted.

**Defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot**

280.    Demand is excused as to the decision of defendants Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot to issue the materially misleading 2017 proxy statement.  On August 16, 2017, these nine defendants solicited shareholder votes to, among other things, approve amendments to Symantec's 2013 Equity Incentive Plan at the Company's 2017 annual meeting on October 5, 2017.  When they approved issuance of the proxy statement, as a result of information learned at the Board and Audit Committee meetings, Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot knew that the Company's public disclosures regarding its controls, its non-GAAP adjustments, and its revenue

1    recognition policies were misleading.  Due to their knowledge of the Company's non-GAAP

2    adjustments to revenue and their discretion to set executive incentive plan targets, these nine

3    defendants knew that the non-GAAP revenue results used to calculate awards under the Executive

4    Annual Incentive Plan were artificially inflated in order to achieve incentive compensation payouts.

5         281.    Additional evidence that Clark, Dangeard, Hao, Humphrey, Mahoney, Sands,

6    Schulman, Unruh, and Vautrinot knew executive incentive compensation was being manipulated to

7    increase payouts include: (i) that the Board's process for setting incentive compensation targets

8    departed sharply from past practice; (ii) the Board belatedly changed the financial metrics used as

9    targets in ways that appear to have benefited management; and (iii) with only three months

10   remaining in the fiscal year the Board decided to change the year during which the results were to

11   be achieved such that 2017 incentive compensation would be evaluated against 2018 results.  Never

12   before had the Board set the targets so late in the year, used the metrics as targets, or measured

13   achievement of incentive compensation.

14        282.    Moreover, Clark, Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh,

15   and Vautrinot knew that EY had been retained to evaluate the issues with Symantec's non-GAAP

16   financial disclosures and concealed the same from shareholders in the proxy statement and until

17   long after the shareholder vote.

18        283.    The decision to issue the proxy statement knowing that it disclosed executive

19   compensation practices and amounts based on improperly inflated results could not have been a

20   valid exercise of business judgment, and was, at a minimum, negligent, subjecting defendants Clark,

21   Dangeard, Hao, Humphrey, Mahoney, Sands, Schulman, Unruh, and Vautrinot to a substantial

22   likelihood of liability for violation of Section 14 of the Securities Exchange Act of 1934.  As a

23   result, demand is excused in connection with the issuance of the misleading 2017 proxy statement.

24   **VIII.   CLAIMS**

25                                          **COUNT I**

26                   **Against All Defendants for Breach of Fiduciary Duty**

27        284.    Plaintiff incorporates by reference and realleges each and every allegation contained

28   above, as though fully set forth herein.

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA                                                                73

285.    Each Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Symantec's business and affairs, particularly with respect to issues as fundamental as public disclosures.

286.    Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Symantec.

287.    In breach of their fiduciary duties owed to Symantec, Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

288.    In particular, Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the Company's financial metrics, including non-GAAP revenue and non-GAAP operating income.

289.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Symantec has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Clark, Noviello, Garfield, Sands, and Vautrinot – *Brophy* Claim

290.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

291.    As alleged above, Clark, Noviello, Garfield, Sands, and Vautrinot are fiduciaries of Symantec, possessed material, non-public information of Symantec, and used that information improperly to profit from sales of Symantec stock.  When Clark, Noviello, Garfield, Sands, and Vautrinot directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

292.    When Clark, Noviello, Garfield, Sands, and Vautrinot sold their Symantec stock, they knew that the investing public was unaware of the negative material information that they

AMENDED COMPLAINT
Case No. 3:19-cv-02522-WHA

possessed.  They also knew that if the information were disclosed, the market price of Symantec stock would be significantly lower.  Clark, Noviello, Garfield, Sands, and Vautrinot timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold.  They thereby benefitted by misappropriating Symantec's non-public information.

293.    Plaintiff has no adequate remedy at law.

## COUNT III

### Against Clark, Noviello, and Garfield for Unjust Enrichment

294.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

295.    By their wrongful acts and omissions, Clark, Noviello, and Garfield were unjustly enriched at the expense of and to the detriment of Symantec.  Clark, Noviello, and Garfield were unjustly enriched as a result of the compensation they received while breaching fiduciary duties owed to Symantec.

296.    Plaintiff, as a stockholder and representative of Symantec, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

297.    Plaintiff, on behalf of Symantec, has no adequate remedy at law.

## COUNT IV

### Violations of Section 14 of the Securities Exchange Act of 1934 Against Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot

298.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

299.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or

misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on August 16, 2017 violated §14(a) and Rule 14a-9 because it: a) it did not disclose that executives exercised discretion over the characterization of certain costs which impacted the non-GAAP metrics used to award incentive compensation; b) that executives had manipulated the non-GAAP metrics by improperly recognizing revenue for contracts were not reasonably likely earned or collectible; c) the non-GAAP adjustments applied to revenue and operating income were improper; d) executive incentive compensation amounts were inflated due to the manipulation of the non-GAAP adjustments; and e) as a result, the Officer Defendants had received millions of dollars' worth of incentive compensation to which they were not entitled.

300.    In the exercise of reasonable care, defendants Clark, Dangeard, Hao, Humphrey, Laybourne, Mahoney, Miller, Sands, Schulman, Unruh, and Vautrinot should have known that the statements contained in the proxy statement were materially false and misleading.

301.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2017 proxy statement solicited shareholder votes for five management proposals including approval of amendments to the Company's 2013 Equity Incentive Plan.  On the basis of representations in the proxy statement, Symantec's public shareholders approved management's proposal to amend the 2013 Equity Incentive Plan.  As a result, the proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

302.    Due to the votes solicited by the proxy statement, Symantec issued millions of shares to the 2013 Equity Incentive Plan.  The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## IX.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Symantec, demands judgment as follows:

A.      Declaring that plaintiff may maintain this action on behalf of Symantec and that plaintiff is an adequate representative of the Company;

1    B.    Against all of the defendants and in favor of the Company for the amount of damages

2  sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of

3  corporate assets, and unjust enrichment;

4    C.    Declaring that Defendants have breached and/or aided and abetted the breach of their

5  fiduciary duties to Symantec;

6    D.    Directing Symantec to take all necessary actions to reform and improve its corporate

7  governance and internal procedures to comply with applicable laws and to protect Symantec and its

8  stockholders from a repeat of the damaging events described herein, including, but not limited to,

9  putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or

10 Articles of Incorporation and taking such other action as may be necessary to place before

11 stockholders for a vote of the following corporate governance policies:

12         1.    a proposal to strengthen the Company's controls over financial reporting;

13         2.    a proposal to strengthen the Board's supervision of operations and develop

14 and implement procedures for greater stockholder input into the policies and guidelines of the

15 Board;

16         3.    a proposal to strengthen Symantec's oversight of its disclosure procedures;

17         4.    a provision to control insider transactions; and

18         5.    a provision to permit the stockholders of Symantec to nominate at least three

19 candidates for election to the Board;

20    E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state

21 statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

22 on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as

23 to assure that plaintiff on behalf of Symantec has an effective remedy;

24    F.    Awarding to Symantec restitution from defendants, and each of them, and ordering

25 disgorgement of all profits, benefits, and other compensation obtained by the defendants;

26    G.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

27 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

28    H.    Granting such other and further relief as the Court deems just and proper.

**X.    JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.

DATED:  July 1, 2022                Respectfully submitted,

By:    _/s/ Pavithra Rajesh_
GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        prajesh@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: mhouston@glancylaw.com
        bsachsmichaels@glancylaw.com

_Counsel for Plaintiff_

# EXHIBIT A

**EXHIBIT A**

| Date: | Audit Committee or Full Board: | Clark: | Dangeard: | Hao: | Humphrey: | Mahoney: | Sands: | Schulman: | Unruh: | Vautrinot: |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/1/2016 | Audit | Y | Y | Y | Y | Y | N | Y | Y | Y |
| 8/2/2016 | Bd | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 8/5/2016 | Audit | N | Y | N | Y | N | Y | N | Y | Y |
| 10/31/2016 | Audit | N | Y | N | Y | N | Y | N | Y | Y |
| 11/4/2016 | Audit | N | Y | N | N | N | Y | N | Y | N |
| 11/15/2016 | Bd | Y | N | Y | Y | Y | Y | Y | Y | Y |
| 1/30/2017 | Audit | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 1/31/2017 | Bd | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 3/9/2017 | Bd | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 5/8/2017 | Audit | Y | Y | N | N | N | Y | N | Y | Y |
| 5/19/2017 | Audit | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 7/31/2017 | Audit | Y | Y | N | Y | N | Y | N | Y | Y |
| 8/4/2017 | Audit | Y | Y | Y | Y | Y | Y | N | Y | Y |
| 10/30/2017 | Audit | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 10/31/2017 | Bd | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 11/16/2017 | Audit | Y | Y | Y | N | Y | Y | N | Y | Y |
| 12/20/2017 | Audit | Y | Y | N | Y | N | Y | Y | Y | Y |
| Total Meetings: | | 14 | 16 | 16 | 11 | 14 | 11 | 16 | 11 | 17 |

DocuSign Envelope ID: 85A2153E-395A-41FE-839C-1A911BED819B

## **VERIFICATION**

I, Guye Lee, do hereby verify that I am a holder of common stock of NortonLifeLock Inc. *f/k/a* Symantec Corporation and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Amended Shareholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

June 28, 2022

_____
Guye Lee

1

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

2

I, the undersigned say:

3

I am not a party to the above case, and am over eighteen years old.  On July 1, 2022, I served

4 true and correct copies of the foregoing document, by posting the document electronically to the ECF

5 website of the United States District Court for the Northern District of California, for receipt

6 electronically by the parties listed on the Court's Service List.

7

I affirm under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on July 1, 2022, at Los Angeles, California.

9

10
_s/ Pavithra Rajesh_____
Pavithra Rajesh

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28